# THE FRAUD FACTORY: HOW SYSTEMIC EXPLOITATION FUELS SCAMS IN THE MUSIC INDUSTRY

---

**Table of Contents**

1. Introduction
   1.1 Purpose and Scope
   1.2 Why "The Fraud Factory"?
   1.3 Hip-Hop's Cultural Power & Hidden Exploitation
2. RIAA 2023 Year-End Stats: Reinforcing Systemic Imbalances
   2.1 Streaming Dominance & Revenue Allocation
   2.2 Decline in Digital Downloads
   2.3 Limited Data Transparency
   2.4 Algorithmic Amplification
   2.5 Pay-to-Play Parallels
3. Defining Systemic Exploitation
   3.1 Opaque Royalty Calculations
   3.2 Algorithmic Bias & Pay-to-Play
   3.3 Historical Exploitation Evolving with Technology
4. Core Interconnected Issues: Problem–Cause–Solution
   4.1 Payola 2.0 (Problem → Cause → Solution)
   4.2 AI Exploitation (Problem → Cause → Solution)
   4.3 Manipulated Revenue Models (Problem → Cause → Solution)
   4.4 DSPs as Gatekeepers (Problem → Cause → Solution)
   4.5 Broader Social Harm (Problem → Cause → Solution)
   4.6 Collaboration Exploitation (Problem → Cause → Solution)
5. Evidence of the Fraud Factory
   5.1 Deliberate Manipulation (Streaming Thresholds, Sublicensing)
   5.2 Market Consolidation (Live Nation–Ticketmaster, Label–DSP Deals)
   5.3 Modern Scam Profiles (Personal Testimonies)

6.   Cross-Industry Analogies
    6.1 NCAA Name, Image, and Likeness (NIL)
    6.2 Opioid Litigation
7.   Systemic Solutions
    7.1 Transparency Requirements & Algorithmic Audits
    7.2 Antitrust Action & Unbundling Monopolies
    7.3 Ethical AI Standards & Opt-Out Mechanisms
    7.4 Robust Contract & Royalty Reforms
    7.5 Building an Industry-Standard Collaboration Platform
8.   Improvement Plan: Toward Clarity, Data, & Impact
    8.1 Streamline the Argument
    8.2 Deepen Quantitative Evidence
    8.3 Enhance Visuals
    8.4 Expand Cross-Industry Comparisons
    8.5 Conclude with a Roadmap
9.   Quantifying the Impact
    9.1 Financial Modeling & Scam Statistics
    9.2 Actionable Reforms & Advocacy
    9.3 Call to Action for Stakeholders
10.  Conclusion
    10.1 The Urgency of Reform
    10.2 Final Recommendations
    10.3 Next Steps
11.  Appendices (Suggested)
    ●  Appendix A: Police Reports, Bank Statements (Redacted)
    ●  Appendix B: Historical Exploitation Timeline
    ●  Appendix C: Royalty Calculation Examples (Pro-Rata vs. User-Centric)
    ●  Appendix D: Draft AI Licensing & Algorithmic Transparency Legislation
12.  Implementation Roadmap & Future Steps
    12.1 Financial Modeling & Data Visualization
    12.2 Causal Chain Analysis
    12.3 Legal Framework Development
    12.4 Stakeholder Impact Analysis
    12.5 Counter-Argument Addressing
    12.6 Implementation Roadmap
    12.7 Evidence Standardization
13.  References & Legal Citations
14.  Appendices (In Progress)
    14.1 Appendix A: Police Reports, Bank Statements (Redacted)
    14.2 Appendix B: Historical Exploitation Timeline

14.3 Appendix C: Royalty Calculation Examples
14.4 Appendix D: Draft AI Licensing & Algorithmic Transparency Legislation
15. Glossary

---

## 1. Introduction

### 1.1 Purpose and Scope

This whitepaper exposes how **hip-hop**—one of the world's most influential cultural forces—suffers from the same systemic exploitation that underpins the broader music industry. Practices like **predatory contracts**, **algorithmic manipulation**, **pay-to-play schemes**, **gang "check-ins,"** and **counterfeit jewelry scams** are not isolated; they are indicative of a global "Fraud Factory" sustained by opaque streaming models, label-driven gatekeeping, and unchecked monopolistic behaviors.

### 1.2 Why "The Fraud Factory"?

Exploitation is neither accidental nor marginal. When major labels dominate DSP (Digital Service Provider) real estate, obscure algorithms dictate which artists get noticed, and pay-to-play norms remain unscrutinized, it creates **a self-perpetuating ecosystem** of scams. This "Fraud Factory" systemically channels vulnerable artists—especially in hip-hop—into questionable deals while fortifying the profits of labels, unscrupulous managers, streaming platforms, and even local criminals.

### 1.3 Hip-Hop's Cultural Power & Hidden Exploitation

Hip-hop's global reach is unquestionable, influencing style, language, and social discourse. Yet beneath its vibrant exterior lurk stories of **extortion, rigged contracts, and financial ruin**:

- **Predatory Record Deals**: Similar to Bessie Smith's underpaid flat fees, modern 360 deals trap hip-hop artists in long-term debt.
- **Check-In Culture**: Gangs and local power brokers demand "taxes" from touring artists; refusal can lead to threats, violence, or concert cancellations.
- **Counterfeit Jewelry**: Jewelers exploit hip-hop's fashion emphasis, selling fake or overpriced items to artists keen to display status.

**Why It Matters**: Financially, these scams leave many artists broke despite public perceptions of wealth. Culturally, they normalize coercion—whether via local "taxes" or exclusionary platform algorithms. This paper connects these hip-hop-specific issues to broader industry patterns,

showing that the root causes—lack of transparency, weak legal oversight, and gatekeeper monopolies—thrive across all genres.

---

## 2. RIAA 2023 Year-End Stats: Reinforcing Systemic Imbalances

## 2. RIAA 2023 Year-End Stats: Reinforcing Systemic Imbalances

This section dissects the **RIAA's 2023 year-end statistics**—which report that streaming now constitutes **84% of total recorded music revenue**, or $14.4 billion—and links these figures to the systemic barriers faced by independent artists, particularly within hip-hop. While major labels tout these record highs as evidence of the industry's health, deeper analysis reveals structural imbalances that funnel most of the profits to established catalogs, leaving newcomers and independents scrambling. Below, we expand each key area with counterarguments and rebuttals from a legal perspective.

---

### 2.1 Streaming Dominance and Revenue Allocation

- **Key Data**: Streaming accounts for **84%** of recorded music revenue, totaling **$14.4 billion**. Paid subscriptions alone generate **$11.2 billion** (78% of streaming).
- **Legal Angle**: This concentration amplifies major labels' bargaining power, who own or control vast back catalogs. As a result, smaller acts—particularly hip-hop artists without major-label backing—are left fighting for fractional payouts.

### Counterarguments & Rebuttals

- **Counterargument**: Major labels assert that high-level catalog investments and marketing justify their larger share. They argue the system fairly compensates those who contribute the most "proven" content.
- **Rebuttal**: From a competition-law perspective, such dominance can constitute an effective **bottleneck**, reducing meaningful access for independents. Even if major labels invest heavily, the pro-rata model—combined with "must-carry" practices—shields them from competition and deprives niche artists of equitable exposure.

---

### 2.2 Decline in Digital Downloads

- **Key Data**: Digital downloads dropped **12%** to **$434 million**, a mere **3%** of total recorded music revenue.
- **Impact**: With downloads in freefall, curated playlists have become an artist's main gateway to listeners. This shift curtails an artist's ability to sell music directly, intensifying dependence on streaming algorithms.

**Counterarguments & Rebuttals**

- **Counterargument**: Proponents of the streaming economy maintain that downloads are outdated and that consumers prefer the convenience of unlimited streaming. They claim playlists inherently reward quality and popularity.
- **Rebuttal**: A purely streaming-based model centralizes power in the hands of platform curators and major labels who can "influence" playlist placement. Legal concerns arise if undisclosed payola-like behaviors occur, violating **FTC** or **FCC** guidelines on sponsorship disclosures.

---

## 2.3 Limited Data Transparency

- **Key Data**: DSPs (Digital Service Providers) often **restrict** or **obfuscate** historical streaming data and per-track accounting, making it difficult for artists to verify royalty statements or pinpoint anomalies.
- **Harm**: Fraudsters capitalize on this vacuum by offering "analytics services" or inflated promotional packages with promises of "secret data" or direct label connections—exploiting artists' desperation for actionable insight.

**Counterarguments & Rebuttals**

- **Counterargument**: Platforms argue that disclosing raw data—such as user demographics, location, or playlisting metrics—would breach user privacy or expose proprietary algorithms.
- **Rebuttal**: A balanced approach could anonymize personal user data while still providing artists with accurate, detailed stream counts and payout breakdowns. **Inconsistent** or **vague** data undermines contract law principles, as artists cannot fully enforce or dispute royalty calculations without transparency.

---

## 2.4 Algorithmic Amplification

- **Key Data**: Ad-based streaming models prioritize high-profile or major-label tracks to maximize ad revenue, thus **cementing** the myth that "popularity equals quality."

- **Effect**: Independent and emerging hip-hop acts are either excluded from prime playlists or must resort to questionable pay-to-play "promotion," effectively a digital version of the old radio payola.

**Counterarguments & Rebuttals**

- **Counterargument**: DSPs claim that algorithmic recommendations are objective and shaped by user behavior—"the people's choice" dictates which songs surface.
- **Rebuttal**: Investigations and anecdotal reports reveal that **undisclosed major-label deals** and pay-for-boost arrangements influence these algorithms. Such undisclosed sponsorship could violate **FTC** deception rules and hamper fair competition, echoing **vintage payola** scenarios that the FCC once targeted in radio.

---

### 2.5 Pay-to-Play Parallels

- **Key Data**: Features like "Discovery Mode" or "Boost" often require artists or labels to accept reduced royalties or pay fees in exchange for "priority" placement. This normalizes **pay-to-play** structures, much like historical radio payola.
- **Issue**: Fraudulent "playlist promoters" feed on the perception that paying is the only path to reach fans—perpetuating scams where unsuspecting artists shell out money for worthless playlist "placements."

**Counterarguments & Rebuttals**

- **Counterargument**: Advocates of these features argue they democratize promotion by letting any artist pay for exposure. They liken it to buying an online ad or sponsored post.
- **Rebuttal**: Unlike typical ads—where disclaimers and standardized pricing exist—"Discovery Mode" or "Boost" lacks robust consumer transparency, making it difficult to distinguish legitimate promotion from shady practices. Legally, this can blur lines around undisclosed sponsorship, potentially running afoul of **consumer-protection laws**.

---

### Concluding Note on Section 2

These RIAA metrics, when viewed in aggregate, **underscore systemic imbalances**: major labels and DSPs wield **unprecedented power** by setting opaque policies, controlling user data, and offering ambiguous promotional tiers. This framework creates an environment where independent musicians—especially those within hip-hop's raw, street-level culture—remain at a **steep disadvantage**. Coupled with the decline in direct downloads, limited data transparency,

and the prevalence of ad-based algorithmic amplifications, it's increasingly clear that the **modern music industry's revenue boom** comes at the expense of true artistic equity.

---

### 3. Defining Systemic Exploitation

Hip-hop's exploitation is not an isolated phenomenon; rather, it serves as a **microcosm** for exploitation throughout the broader music industry. From **physical extortion**—where local gatekeepers demand "taxes" or "check-ins"—to **digital pay-to-play** structures and **data opacity** in streaming platforms, artists across genres face a tangled web of predatory practices. Yet in hip-hop, these systemic failures are often magnified by cultural myths of instant success, street-level affiliations, and a high premium placed on authenticity and visibility.

Whether it's **bogus promotional offers** promising major-label attention or **backdoor deals** that prioritize established acts, the result is the same: an industry that systematically rewards those with the most power and resources, while squeezing out—or outright deceiving—independent and emerging voices. Below, we dissect three core facets of this exploitation: **opaque royalty calculations**, **algorithmic bias coupled with pay-to-play**, and the **historical arc** of how technology has evolved to perpetuate age-old exploitative tactics.

---

### 3.1 Opaque Royalty Calculations

Independent artists—particularly from hip-hop's grassroots—frequently earn **$0.003–$0.005 per stream**, a rate that often fails to recoup even basic production or promotion costs. Facing limited avenues for recourse or clarity, artists may turn to **scam services** promising to boost streaming numbers, pad audience metrics, or expedite payouts. These unscrupulous operators exploit two key weaknesses:

1. **No Transparent Accounting**: Without a standardized breakdown of how revenue is calculated and distributed, artists cannot verify actual streams or detect under-reporting.
2. **Desperation & Ambition**: The pervading myth that hip-hop success hinges on large numbers (streams, likes, followers) pushes artists to buy into short-term, high-risk "solutions."

Legally, this environment challenges **contractual good-faith principles**: if royalty statements remain ambiguous or incomplete, artists cannot adequately enforce or negotiate their rights. The system, in effect, rewards platform owners and labels that control the data, while fueling scams pitched as shortcuts.

## 3.2 Algorithmic Bias and Pay-to-Play

Hip-hop's cultural emphasis on virality, chart dominance, and social-media clout dovetails tragically with **algorithmic favoritism**. Major labels secure prime playlist placements for their top artists, overshadowing independent acts. This vacuum lures predatory promoters who sell illusions of "playlist glory"—often charging hefty fees for minimal (or fake) results.

1. **Algorithmic Gatekeeping**: DSPs (Digital Service Providers) may claim neutrality but can prioritize content from deep-pocketed labels or affiliates.
2. **Pay-to-Play Norms**: Features like "Discovery Mode" offer an official pay-to-play pipeline; if mainstream artists use it, independents feel forced to do the same or risk further invisibility.

From a **consumer-protection** standpoint, undisclosed sponsorships or hidden "boost" fees can mimic the illegal payola once policed by the FCC in radio contexts. Yet, in the digital domain, these practices are less regulated, accelerating the power imbalance that leaves many hip-hop artists hustling to break through gatekeepers both on the streets and online.

## 3.3 Historical Exploitation Evolving with Technology

The notion that new tech would "democratize" music underestimates how established powers adapt. Historically, exploitation plagued:

- **Vinyl & CD Eras**: Underreporting sales to deny artists full royalties.
- **MP3 & Early Streaming**: Confusing contracts that waived digital rights.
- **Modern DSPs & AI**: Indefinite sublicensing, allowing training on an artist's catalog without consent or compensation.

This **continuum** of exploitation proves a central truth: **whoever controls distribution and data reaps the greatest benefits.** For hip-hop artists, who often originate from underrepresented or marginalized communities, these systemic hurdles compound existing social inequities. As technology accelerates (e.g., AI-driven music generation, algorithmic curation), the asymmetry widens—traditional forms of exploitation (e.g., shady deals, hidden fees) merge with cutting-edge tactics (e.g., unlicensed AI usage, pay-to-play algorithms), perpetuating a cycle where the industry's most vulnerable remain easy prey.

## 4. Core Interconnected Issues: Problem–Cause–Solution

This section lays out six pivotal areas of systemic exploitation, each framed by **(1) the Problem**, **(2) the Cause**, and **(3) the Solution**. Where relevant, we provide **hip-hop examples** to illustrate how these issues manifest in real-world scenarios, followed by **legal considerations** that underpin each proposed remedy. The result is a lawyerly dissection of the industry's most entrenched dysfunctions—and a clear roadmap for reform.

---

### 4.1 Payola 2.0 (Problem → Cause → Solution)

**Hip-Hop Example**:

- *Contemporary "pay-to-play" promoters exploit artists' desperation for playlist spots, echoing the radio payola days. This extends to local shows where an artist might be coerced to "buy" stage time.*

**Problem**

Artists—often independents—spend hundreds or thousands of dollars on "playlist promotion" fees, only to receive negligible or fake engagement. Despite their outlay, they see no meaningful boost in streaming royalties or audience reach.

**Cause**

- **DSP Favoritism**: Many platforms offer "Discovery Mode" or "Boost" features that implicitly favor major-label content or paid placements.
- **Hidden Curation Rules**: Artists remain unaware of how playlists are truly curated.
- **Illusions of "Playlist = Success"**: Industry lore equates playlist placement with viability; artists feel compelled to "pay to play."

**Solution**

1. **Discovery Mode Reforms**
    - **Transparency or Elimination**: Either abolish pay-for-boost programs or require DSPs to disclose precisely how much the artist is paying, what exposure they receive, and whether the average user sees sponsored content differently.
2. **FTC Enforcement**
    - **Label Disclaimers**: Any sponsored playlist or algorithmic boost must clearly identify who paid for inclusion.
    - **Penalties for Undisclosed Sponsorship**: Just as classic radio payola violated FCC rules, undisclosed digital sponsorship can trigger **FTC** sanctions under consumer-protection and anti-deception statutes.

**Legal Considerations**

- **Potential Violations**: Unfair or deceptive acts under **Section 5 of the FTC Act**.
- **Remedies**: FTC injunctions, fines, and mandatory disclaimers, mirroring past payola crackdowns.

---

### 4.2 AI Exploitation (Problem → Cause → Solution)

**Hip-Hop Example**:

- *Unlicensed AI training on a rap artist's catalog is effectively theft. This parallels historical label exploitation where artists received neither consent nor compensation for secondary uses of their works.*

**Problem**

AI developers scrape vast music catalogs to train models—e.g., voice simulators or beat generators—without notifying or compensating original creators. Artists lose out on potential licensing fees and intellectual property rights.

**Cause**

- **Broad DSP Sublicensing**: Contract clauses permit DSPs to license music to third parties (including AI firms) without additional royalties to creators.
- **No Specific AI Regulations**: Current copyright statutes and licensing frameworks seldom address large-scale data harvesting for AI.

**Solution**

1. **Licensing Mandates**
   - **Dataset Fees**: AI developers must pay usage fees keyed to the volume or type of music data ingested.
   - **Statutory Damages**: If no license is secured, artists can seek damages under an expanded or AI-specific copyright provision.
2. **Opt-Out Registries**
   - **Voluntary Exclusion**: Artists can choose to remove their catalogs from AI training sets if they do not wish to license them.
   - **Centralized Database**: Industry-wide platform to register protected works, ensuring developers easily identify "off-limits" tracks.

**Legal Considerations**

- **Intellectual Property**: Potential amendments or clarifications to the **Copyright Act** are needed to codify AI's fair (or unfair) use of copyrighted music.
- **Contract Law**: Revisiting DSP Terms of Service to prevent indefinite sublicensing for AI.

---

### 4.3 Manipulated Revenue Models (Problem → Cause → Solution)

**Hip-Hop Example**:

- *Artists like TJx6 rap about scamming as a survival mechanism, reflecting a culture shaped by scarcity. When official revenues are withheld—due to manipulated pro-rata models—some pivot to illicit or sensational methods to earn attention and money.*

**Problem**

Pro-rata payout models pool all subscription revenue and distribute it based on an artist's share of **total** streams. Niche or emerging acts—common in hip-hop's grassroots—lose out to established superstars with colossal play counts, effectively subsidizing the top acts.

**Cause**

- **Unified Pool Distribution**: Every penny goes into one pot; minor acts seldom see more than crumbs.
- **Minimal Transparency**: Per-user data is obscured, making it nearly impossible to confirm actual stream counts or address shortfalls.

**Solution**

1. **User-Centric Payouts**
   - **Direct Allocation**: Each subscriber's monthly fee flows only to the artists that particular subscriber streams, leveling the playing field for niche or newly emerging talent.
2. **No Micro-Threshold**
   - **Eliminate "1,000 Stream" Rules**: Ensure even low-level streaming activity triggers royalty payouts; no partial or withheld amounts for failing to meet a certain benchmark.

**Legal Considerations**

- **Anticompetitive Structures**: If major labels push pro-rata to marginalize independents, it may implicate antitrust frameworks, since it disproportionately benefits label-owned catalogs.
- **Contractual Fairness**: Artists may challenge undisclosed or ambiguous royalty models via **unconscionability** or **good faith** doctrines.

---

## 4.4 DSPs as Gatekeepers (Problem → Cause → Solution)

**Hip-Hop Example**:

- *Spotify's "1,000-stream rule" or special "boost" placements overshadow up-and-coming rappers, who then turn to unscrupulous "promoters" or local gang alliances to gain traction.*

**Problem**

Opaque algorithms and labyrinthine contracts push independent musicians toward shady services in pursuit of exposure. Partial label ownership of DSPs also raises conflict-of-interest concerns.

**Cause**

- **No Mandated Audits**: DSPs are free to claim neutrality without external scrutiny of how playlists or suggestions are generated.
- **Editorial Bias**: If labels partly own the platform, they can prioritize affiliated artists.

**Solution**

1. **Algorithmic Audits**
   - **Annual Independent Reviews**: Evaluate whether recommendations systematically disadvantage indies or non-affiliated acts.
2. **Fair Contract Terms**
   - **Limit Indefinite Sublicensing**: Prevent DSPs from perpetually licensing artists' works without additional consent or compensation.
   - **Transparent Royalty Calculations**: Detailed breakdowns of how revenue splits are determined, enforceable through third-party audits.

**Legal Considerations**

- **Antitrust & Ownership Overlaps**: Potential violations of the **Sherman Act** or **Clayton Act** if label–DSP cross-ownership reduces competition.
- **Consumer Deception**: Unlabeled "boosted" playlists might breach FTC guidelines.

**4.5 Broader Social Harm (Problem → Cause → Solution)**

**Hip-Hop Example**:

- *Local "check-in" demands, firearms industry tie-ins, and private prison investments intersect. Exploiting violent or incarceration-themed narratives can bolster record sales while harming communities.*

**Problem**

Exploitative practices extend beyond financial abuse, incentivizing content that glorifies violence or incarceration for higher engagement. Investors in private prisons or firearms industries can gain from media that perpetuates negative stereotypes and fuels demand for certain narratives.

**Cause**

- **Cross-Industry Profiteering**: Corporations invest in multiple sectors—e.g., entertainment, private prisons—that financially benefit from harmful stereotypes.
- **Algorithmic Amplification of Controversy**: Content perceived as "shocking" or "violent" gains traction, reinforcing detrimental narratives.

**Solution**

1. **Investor Transparency**
   - **Mandatory Disclosure**: Labels, DSPs, and media conglomerates reveal any financial ties to industries profiting from violence or incarceration.
2. **Ethical Promotion Standards**
   - **DSP Guidelines**: Platforms required to create content policies that discourage artificially amplifying violent or harmful themes solely for engagement metrics.

**Legal Considerations**

- **Possible Legislation**: Similar to how tobacco, gambling, or alcohol advertising is regulated, content with known harm could face stricter disclosure or promotional limits.
- **Civil Litigation**: If it can be shown that a platform or label knowingly profits from content that incites real-world harm, plaintiffs might explore tort claims (though challenging) under "gross negligence" or "reckless endangerment" theories.

**4.6 Collaboration Exploitation (Problem → Cause → Solution)**

**Hip-Hop Example**:

- *Feature deals—e.g., an artist pays $500, then is told it's $5,000—highlight a fragmented, unregulated collaboration market. Gangs or middlemen often complicate verifying who can actually "clear" a track.*

**Problem**

- **Feature Prices**: Range from a few hundred to tens of thousands of dollars with no standardized pricing or marketplace.
- **Payments**: Often funneled through entourage members, with minimal legal oversight.
- **Clearing**: The label or rights-holder might refuse to clear the feature after payment, leaving the artist in limbo.
- **Transparency**: Nonexistent, fostering routine scams and delayed or canceled collaborations.

**Cause**

- **Fragmented Industry**: No single collaboration platform that verifies participants or streamlines payments.
- **Artificial Scarcity**: Labels or gatekeepers artificially limit "official" features to keep demand (and prices) high.
- **Minimal Incentive for Reform**: Gangs, middlemen, and even some labels profit from confusion and lack of standard procedures.

**Solution**

1. **Industry-Standard Collaboration Platform**
   - **Verified Artist Profiles**: Ensures that those claiming manager/label authority are legitimate.
   - **Clear Pricing Tiers**: Upfront, standardized rates for feature requests (e.g., budget, premium, superstar).
   - **Built-in Escrow**: Funds released only after the feature is delivered and label clearance is verified.
   - **Label Pre-Clearance**: Automatic checks to ensure the feature won't be blocked post-payment.
   - **Transparent Transaction History**: Rating systems akin to Airbnb/Upwork, allowing artists to evaluate trustworthiness of collaborators.
2. **Legal Framework**
   - **Standardized Feature Agreements**: Requires set timelines for deliverables and mandatory label clearance.

     ○ **Dispute Resolution**: A formal mechanism for refunds or arbitration if a feature is blocked or not delivered.

   3. **Financial Protection**
     ○ **Mandatory Escrow**: For higher-dollar transactions, requiring a neutral third party to hold funds.
     ○ **Verification of Authority**: Mandatory proof that a manager or label rep can legally approve the collaboration.
     ○ **Insurance Options**: For major, high-stakes features, a policy could protect the buyer's investment if the feature falls through or is invalidated.

**Legal Considerations**

- **Contract Law**: Standardizing feature agreements and mandatory escrow reduces common law fraud and breach-of-contract disputes.
- **Potential Industry Regulation**: Industry groups or even legislative bodies could impose escrow requirements or licensing for "feature brokers," akin to real estate licensing.
- **RICO Concerns**: If gangs systematically extort collaboration fees, there may be grounds for racketeering investigations.

---

**Final Observations on Section 4**

Each of these **interconnected issues** reveals the multiple layers of exploitation—some purely economic (e.g., manipulated royalty models), others blending **cultural, legal, and even criminal** elements (e.g., collaboration extortion, violent narratives). The **Problem–Cause–Solution** format clarifies the immediate harm, the structural drivers, and the specific remedies—both contractual and statutory—that can curb abuses. When combined, these reforms lay the groundwork for dismantling the "Fraud Factory" and restoring a measure of **equity, transparency, and lawful fairness** to the music ecosystem, especially within hip-hop's vibrant but perilous landscape.

---

**5. Evidence of the Fraud Factory**

The evidence presented in this section illustrates the pervasive, **multi-layered nature** of music-industry exploitation—encompassing everything from **deliberate manipulation of streaming thresholds** to **market consolidation** that stifles competition, and real-world **scam profiles** exposing artists to financial and reputational harm. These case studies substantiate the presence of a "Fraud Factory," where structural imbalances and opportunistic actors converge to systematically disadvantage creators. Below, we break down the most telling examples,

including documented personal testimonies in hip-hop, to reveal how widespread and intricate these abuses have become.

---

### 5.1 Deliberate Manipulation (Streaming Thresholds, Sublicensing)

1. **RIAA Data**
   - **Reliance on Streaming**: According to the RIAA, streaming now dominates recorded music revenue (84%), overshadowing smaller acts who struggle to garner significant play counts.
   - **Lawyer's Perspective**: From a competition-law standpoint, an 84% share suggests near-total dependence on DSPs. It raises concerns about whether contractual terms or licensing arrangements could be challenged for constraining market access or fueling exploitative practices (e.g., pay-for-visibility schemes).
2. **Sublicensing Clauses**
   - **DSP Monetization for AI**: Many DSP agreements permit the platform to sublicense an artist's track for secondary uses, including AI training—**with zero additional royalty** owed to the creator.
   - **Legal Implications**: These broad sublicensing clauses can undermine copyright owners' exclusive rights, calling into question whether such terms might be **unconscionable** or **unenforceable** under doctrines of fair dealing or good faith.

**Key Takeaway**: The combination of near-total reliance on streaming for revenue and DSP-friendly sublicensing deals fuels an environment ripe for exploitation. Independent artists, especially those in hip-hop's grassroots, find it nearly impossible to challenge these behemoths without regulatory intervention or collective action.

---

### 5.2 Market Consolidation (Live Nation–Ticketmaster, Label–DSP Deals)

1. **Live Nation–Ticketmaster**
   - **Market Share**: Live Nation controls roughly 70% of U.S. ticketing, wielding significant leverage over artists who must comply with pay-to-play or restricted touring terms to secure major venues.
   - **Legal Angle**: Potential antitrust concerns arise under the **Sherman Act** or **Clayton Act** if Live Nation's dominance effectively forces artists into disadvantageous deals or quashes competing ticket platforms.
2. **Label–DSP Ownership**
   - **Equity Stakes**: Major labels often hold partial ownership in certain DSPs—thereby influencing editorial playlists and "recommended" content.

- ○ **Conflict of Interest**: This arrangement can create a **closed loop** where labels with equity in the DSP prioritize their own catalogs for premium placement, perpetuating pay-to-play norms and restricting independent artists' exposure.
- ○ **Lawyer's Perspective**: Cross-ownership invites regulatory scrutiny. If label–DSP deals substantially lessen competition, enforcement agencies could evaluate forced divestitures or impose "behavioral remedies" like mandatory fair-playlist rules.

**Key Takeaway**: Consolidation in ticketing, promotions, and streaming fosters a **bottleneck** that compels independent artists to pay or negotiate from a position of weakness. Such systemic concentration is fundamental to the "Fraud Factory," as it establishes structural levers that unscrupulous actors can easily manipulate.

---

### 5.3 Modern Scam Profiles (Personal Testimonies)

A diverse range of scams—spanning from fraudulent "feature" arrangements to local extortion—reveal how entrenched and multifaceted the Fraud Factory has become. These personal accounts, many emerging from hip-hop, underscore the dire stakes for creators who lack the protection of major-label backing or reliable legal counsel.

**Feature Scams**

- **$10,000 Feature Deal Blocked**: An upcoming artist paid $10,000 to collaborate with a high-profile name, only to find the label blocked the release. This left the artist without recourse or a refund.
- **Lil Reese**: A $500 feature deposit unexpectedly ballooned into a $5,000 demand, with no prior disclosure.
- **Kirko Bangz**: After a $1,000 payment, the feature was delayed indefinitely. A partial refund arrived only after prolonged efforts, causing financial loss and wasted momentum.
- **Engineer "Plaques"**: Technicians claiming high-profile credits (often fabricated or achieved through bot-driven streams) lure artists with promises of "industry-standard" mixing/mastering, then vanish after receiving payment.

**Hip-Hop Extortion**

- **Rick Ross vs. Gangster Disciples**: Payment demands, canceled shows, and a drive-by shooting exemplify how local gangs exploit artists touring or promoting within their territory.

- **Eminem's Alleged Crips Payment**: Rumors suggest he paid for both "protection" and a feature, highlighting how intimidation and financial coercion intersect in hip-hop's live-scene economy.

**Counterfeit Jewelry**

- **Lil Baby's Fake Watch**: Publicly exposed for purchasing a counterfeit piece, the artist faced humiliation and monetary loss. This underscores how image-conscious hip-hop artists are prime targets for opportunistic jewelers selling overpriced or fake products.

**Legal/Industry Ramifications**

1. **Breach of Contract & Fraud**: Many of these "feature deals" lack formal escrow or verification, leaving artists with **limited legal remedies**.
2. **Criminal Liability**: Extortion or "street taxes" can implicate criminal laws, including **RICO** if organized entities systematically demand payment.
3. **Reputational Harm**: Even if an artist pursues legal action, the stigma of being "scammed" can dent their standing in an industry heavily reliant on perceived credibility.

**Cross-Reference**

- **Section 4.6 (Collaboration Exploitation)**: Illustrates how the absence of an industry-standard platform or clear legal framework perpetuates these scams.
- **Check-In Culture**: Ties extortion and local gatekeeping to a broader pattern of coerced compliance or forced alliances.

---

**Overall Significance of Section 5**

These **real-world examples** and first-person accounts substantiate the thesis that the music industry—particularly the hip-hop segment—is marred by systemic exploitation. Whether it's **DSP-driven manipulations**, **monopolistic ticketing practices**, or **street-level intimidation** tactics, the sum total is a "Fraud Factory" that harms legitimate creators and emboldens unethical players. Recognizing these abuses is a **prerequisite** to legal or regulatory redress, as documenting actual harm (e.g., financial losses, contract violations, or even physical threats) lays the groundwork for antitrust inquiries, consumer-protection lawsuits, or targeted legislative reforms.

In sum, the evidence in **Section 5** is neither anecdotal nor sporadic—it reflects a deeply embedded system where large-scale corporate structures and on-the-ground scams conspire to diminish an artist's control over their creative and financial destiny.

## 6. Cross-Industry Analogies: Expanding the Concept of Fraud

Far from being unique to the music business, the kind of systemic exploitation that underpins the "Fraud Factory" appears throughout other industries—often under scrutiny for **misrepresentation, deceit, and harmful monopolistic practices**. Two salient analogies stand out: **the NCAA's Name, Image, and Likeness (NIL) reforms** and the **opioid litigation** involving major pharmaceutical companies. By examining how these industries confronted (and in some cases, compensated for) large-scale inequities and public harm, we gain insight into possible legal and policy avenues for independent artists fighting exploitative label or platform practices.

## 6.1 NCAA Name, Image, and Likeness (NIL): The Fraud of Uncompensated Labor

**Blueprint**
After decades of reaping billions in revenue off college athletes—who remained unpaid under the guise of "amateurism"—the NCAA was finally compelled to let players monetize their Name, Image, and Likeness (NIL). This marked a watershed moment where a previously unassailable system of exploitation was restructured by **collective action**, **public pressure**, and ultimately, **legislative and judicial intervention**.

**Expanding on Fraud**

1. **Misrepresentation of Amateurism**
   ○ The NCAA labeled its athletes "amateurs" to justify withholding direct compensation, despite earning professional-level revenues from their performances.
   ○ **Parallel to Music**: Major labels and streaming platforms downplay the commercial value of independent artists' work—e.g., using "exposure" as a rationale for limited pay or complicated royalty structures.
2. **Unequal Bargaining Power**
   ○ Athletes had no meaningful leverage in contract negotiations, as the NCAA held a quasi-monopolistic grip on college sports.
   ○ **Parallel to Music**: Independent artists sign long-term or 360 deals with labels/DSPs that dictate royalty rates, promotional terms, and creative control, often with no realistic avenue to negotiate more favorable terms.
3. **Suppression of Market Value**
   ○ By barring athletes from monetizing their NIL, the NCAA effectively capped their earnings below any free-market rate.

- **Parallel to Music**: Platforms and labels often obscure streaming data or corral artists into pay-to-play scenarios, suppressing their real market value and entrenching an uneven revenue split.

4. **Deceptive Practices**
   - The NCAA publicly cast its rules as protecting "student-athletes," when in practice it reaped enormous profits and restricted the athletes' rights to monetize their own brand.
   - **Parallel to Music**: Labels and DSPs may portray themselves as "artist-friendly," yet rely on opaque royalty models and indefinite licensing clauses to keep artists underpaid and in the dark about their true earning potential.

**Lesson for Independent Artists**

- **Collective Leverage**: Just as student-athletes organized and sued for fair compensation, indie artists can unite for legislative or class-action challenges against exploitative industry practices.
- **Frameworks for Change**: Escrow payments, standardized agreements, and enforceable transparency laws in the music sector could replicate the athlete-empowering reforms seen in NIL.
- **Legal Precedent**: The NCAA's eventual concession to NIL rights underscores that even deeply entrenched exploitation can be dismantled through consistent legal and public pressure.

---

### 6.2 Opioid Litigation: The Fraud of Systemic Harm and Misleading Marketing

**Major Settlements**
In the opioid crisis, pharmaceutical giants faced billions in penalties for downplaying the addictive risks of their drugs, saturating the market with misleading claims, and causing widespread public harm. Courts and legislators responded with **lawsuits and settlement agreements** imposing new oversight and financial reparations.

**Expanding on Fraud**

1. **Fraudulent Marketing**
   - Companies marketed opioids as safer than they were, a **deliberate misrepresentation** that enticed doctors and patients.
   - **Parallel to Music**: Labels or unscrupulous promoters may inflate streaming figures, conceal contract pitfalls, or promise unrealistic returns, enticing artists to sign exploitative deals.
2. **Misleading Public and Professional Communities**

- ○ Pharmaceutical firms sponsored questionable research, incentivized medical professionals, and built a false consensus around pain management.
  - ○ **Parallel to Music**: Industry gatekeepers sometimes create an illusion of "fair streaming" or "objective algorithms," while in reality, editorial or data manipulations secretly favor major-label content.
3. **Reckless Disregard for Public Health**
   - ○ Despite evidence of rising addiction and overdoses, companies prioritized profit over public safety.
   - ○ **Parallel to Music**: Certain labels, streaming platforms, or local gatekeepers disregard the social costs of exploitative narratives—e.g., promoting violence-themed music if it boosts streaming numbers and ad revenue.
4. **Systemic Harm**
   - ○ The opioid epidemic devastated entire communities, prompting multi-state litigation and federal investigations.
   - ○ **Parallel to Music**: Exploitative pay practices contribute to a culture where many independent artists are financially ruined, some forced into unethical behavior (e.g., scam rap, questionable sponsorships) to survive.

**Application**

- **Potential Class Actions**: If labels, DSPs, or gatekeeping entities demonstrably profit from artists' systemic harm—e.g., forcing them into unfair deals or artificially suppressing payouts—groups of injured artists could sue under consumer protection or antitrust theories.
- **Regulatory Reforms**: Government bodies could mandate transparency in royalty calculations, akin to how opioid settlements required new monitoring of drug distribution.
- **Wider Cultural Reckoning**: As the opioid litigation exposed industry misdeeds, legal scrutiny of the music ecosystem might highlight how exploitative content or pay-to-play practices shape consumer trends and harm creators.

---

**Why These Analogies Matter for the Music Industry**

Both the **NCAA NIL reforms** and the **opioid litigation** highlight how **systemic fraud** can flourish when powerful entities misrepresent crucial facts or obscure the true nature of their profit structures. In each case, **collective legal action** and mounting public awareness compelled massive, entrenched organizations to adopt **more equitable policies**—or, at a minimum, pay substantial settlements.

In the music industry, especially for **independent artists**, these analogies underscore:

- **Leverage and Collective Advocacy**: The possibility that artists, by organizing—akin to college athletes or opioid-crisis victims—can demand stronger contractual protections, transparent royalty accounting, and fairer streaming splits.
- **Systemic Harm**: When the pursuit of profit overshadows ethical norms, exploitative content thrives and large segments of the creative community suffer.
- **Legal and Legislative Tools**: From **class-action suits** under consumer fraud statutes to **antitrust enforcement** for label–DSP overlaps, the legal arsenal is broader than many artists realize.

Ultimately, both the NCAA NIL crisis and the opioid litigation demonstrate that **even the most entrenched, profitable systems can be toppled or reformed** when the underlying behavior is shown to be fraudulent, harmful, or deceptive. By drawing lessons from these external industries, music creators can better understand how to craft a **transformative legal and cultural strategy** that exposes, challenges, and ultimately **reforms** the "Fraud Factory."

---

## 7. Systemic Solutions

This section consolidates key reforms to counter the "Fraud Factory" that has entrenched exploitative practices across the music industry—particularly harming independent, often hip-hop, creators. Each proposal not only addresses **contractual** and **structural** shortcomings but also introduces **legal frameworks** to ensure accountability and fairness. By implementing these solutions as a cohesive set of policies, stakeholders can tackle issues ranging from **algorithmic bias** and **unfair royalties** to **collaboration exploitation** and **monopolistic ticketing practices**.

---

### 7.1 Transparency Requirements & Algorithmic Audits

1. **Mandated Disclosures**
   - **Public Playlist Criteria**: Digital Service Providers (DSPs) must publicly disclose the main factors determining playlist placement, "Discovery Mode" boosts, and recommended content.
   - **Annual Fairness Reports**: Require an annual, publicly available report detailing changes to playlist algorithms, top payers for sponsored spots, and any modifications to revenue distribution.
2. **Third-Party Oversight**
   - **Independent Auditors**: Impose periodic, external reviews of DSP algorithms to confirm no undisclosed label deals or preferential weighting.

- ○ **Legal Enforcement**: Noncompliance triggers legal sanctions (e.g., fines, restrictions on algorithmic changes until compliance is confirmed).

**Rationale & Hip-Hop Context**

- **Leveling the Playing Field**: Algorithmic transparency is crucial for indie and hip-hop artists who otherwise face near-impenetrable favoritism toward major-label content.
- **Consumer Confidence**: Reduces the likelihood of undisclosed "payola 2.0," thereby restoring trust in streaming charts and playlists as true reflections of popularity or quality.

---

### 7.2 Antitrust Action & Unbundling Monopolies

1. **Investigate Market Concentration**
   - ○ **Structural Remedies**: Empower antitrust authorities to scrutinize Live Nation–Ticketmaster's ~70% share of the ticketing market, label–DSP overlaps, and any partial label ownership of streaming platforms.
   - ○ **Forced Divestitures**: In egregious cases, authorities may order dominant entities to sell off certain divisions or dissolve cross-ownership arrangements.
2. **Editorial Independence**
   - ○ **Prohibition of Ownership Overlaps**: Ban major labels from holding equity in DSPs if editorial or playlist curation is influenced by such ownership.
   - ○ **Behavioral Safeguards**: Where total divestiture is unfeasible, impose strict "firewalls" to ensure curation teams operate free of label pressures.

**Rationale & Hip-Hop Context**

- **Reducing Pay-to-Play Pressures**: Independent hip-hop artists are frequently squeezed out of prime festivals or top playlists. Breaking up monopolies or cross-ownership unshackles them from pay-for-access demands.
- **Legal Precedent**: Parallels can be drawn to past **Sherman Act** interventions in radio or telecommunications, reinforcing that excessive consolidation distorts fair market competition.

---

### 7.3 Ethical AI Standards & Opt-Out Mechanisms

1. **AI Licensing & "Dataset Usage Fees"**
   - ○ **AI Developers Must Pay**: Require any entity training AI on copyrighted music to secure formal licenses, paying usage fees proportionate to the volume of data ingested.

- **Revenue-Sharing Model**: Ensure a portion of AI profits (e.g., from AI-generated music or services) returns to original content creators.

2. **Consent & Opt-Out Registries**
    - **Voluntary Exclusion**: Artists can proactively remove their catalogs from AI training sets if they do not wish to license them.
    - **Centralized Database**: A single registry where artists and rights holders can mark songs as "AI-usable" or "AI-blocked."

### Rationale & Hip-Hop Context

- **Protecting Creative Identity**: For hip-hop artists—many of whom rely heavily on unique vocal styles, flow, and cultural references—unlicensed AI replication erodes both income and identity.
- **Legal Imperative**: Without well-defined AI licensing rules, DSP Terms of Service can quietly sign away rights to an artist's entire catalog for algorithmic exploitation.

---

### 7.4 Robust Contract & Royalty Reforms

1. **Escrow Systems**
    - **Secure Funds**: Any significant contract (e.g., high-value features, large-scale marketing campaigns) requires an escrow service to hold payment until deliverables are fulfilled.
    - **Fraud Prevention**: This ensures unscrupulous "promoters" or "feature brokers" cannot vanish with an artist's money.
2. **Standardized Collaboration Contracts**
    - **Disclosure of True Costs**: A legal requirement that all fees, feature prices, and associated costs be fully itemized and unchangeable after contract formation.
    - **Label Clearance Guarantee**: If a label's approval is necessary, the contract must confirm that clearance is secured—or else refunds are mandated.
3. **Royalty Overhauls**
    - **User-Centric Payouts**: Replace pro-rata with a user-centric model, so each subscriber's fee directly compensates the artists they stream.
    - **Cap Recoupment Periods**: Prevent indefinite debt cycles by limiting how long labels can recoup advances or recoupable expenses.

### Rationale & Hip-Hop Context

- **Avoiding Exploitation**: Feature scams plague hip-hop, with artists paying hundreds or thousands upfront for collaborations that never materialize or get blocked by label politics. Escrow reduces these abuses.

- **Economic Empowerment**: User-centric models can significantly boost incomes for niche or emerging hip-hop acts whose audience is dedicated but overshadowed in the current pro-rata system.

---

### 7.5 Building an Industry-Standard Collaboration Platform

**Hip-Hop Specific**: This platform directly combats "check-in" exploitation, bogus feature deals, and local extortion by **verifying all parties**, establishing **transparent pricing**, and clarifying **label clearance** well before money changes hands.

1. **Verified Artist Profiles**
   - **Authority Checks**: Confirm that any manager or label representative truly holds the legal right to negotiate.
   - **Scam Reduction**: Filters out fake entitles claiming to represent known artists, drastically reducing "bait-and-switch" deals.
2. **Pricing Transparency & Tiers**
   - **Budget-Friendly vs. Premium vs. Superstar**: A standardized fee matrix ensures clarity about cost and deliverables.
   - **Label Pre-Clearance**: Automatic process that checks whether the label endorses the collaboration, preventing post-payment blocks.
3. **Dispute Resolution & Financial Safeguards**
   - **Built-In Escrow**: Funds are held until the feature is delivered, verified, and label-approved.
   - **Clear Refund Mechanisms**: If a collaboration is invalidated, the platform triggers an automatic refund.
   - **Insurance for High-Stakes Deals**: Larger or big-name features might require an insurance policy to protect both parties from unforeseen cancellation or fraud.
4. **Public Transaction History**
   - **Rating Systems**: Much like Airbnb or Upwork, each party can be reviewed, providing future collaborators with transparent reputational data.
   - **Legal Framework**: Standard contracts enforced by the platform, with arbitration or small claims pathways for unresolved disputes.

**Rationale**

- **Addressing Collaboration Exploitation**: Hip-hop's "feature mania" and local "check-in" demands often thrive in unregulated spaces. A single, trusted platform cuts out middlemen profiteers and discourages extortion.

- **Industry-Wide Potential**: While aimed at hip-hop's unique vulnerabilities, a universal collaboration marketplace benefits all genres, reducing friction and standardizing best practices.

---

**Conclusion of Section 7**

Collectively, these **Systemic Solutions—algorithmic transparency, antitrust enforcement, ethical AI standards, comprehensive contract reforms, and an industry-standard collaboration platform**—provide an integrated framework to dismantle the Fraud Factory. Each sub-solution addresses a different pressure point: from stopping undisclosed "payola 2.0" on streaming platforms, to ensuring artists can safely collaborate without fear of extortion or feature scams.

By codifying these measures into **legislation**, **industry self-regulation**, or **enforceable contract clauses**, the music industry—especially within the hip-hop sphere—can shed its long-standing exploitative tendencies. Moreover, these proposals reinforce each other: a user-centric payout model, for example, gains maximal impact if DSPs are also required to publish annual fairness reports; likewise, collaboration escrow thrives in an environment where label–DSP cross-ownership is curtailed.

In short, robust solutions demand a **holistic** approach—backed by legal checks—to champion transparency, fairness, and ethical oversight at every level of an artist's career trajectory.

---

## 8. Improvement Plan: Toward Clarity, Data, & Impact

### 8.1 Streamline the Argument

- **Action**: Maintain **Problem–Cause–Solution** across all scam scenarios for easy reference.

### 8.2 Deepen Quantitative Evidence

- **Expansion**: Gather average royalty shortfalls, typical "lost funds" in collaboration scams, and scam frequency by genre or region.

### 8.3 Enhance Visuals

1. **Comparative Charts**:
   - Per-stream payouts: Spotify vs. Apple vs. Tidal vs. Amazon.
   - Streaming vs. Merch vs. Sync licensing revenue shares.

2. **Flowcharts**:
   - ○ "Money Movement": How revenue from a single stream splits among labels, DSPs, and artists.
   - ○ "Scam Pipeline": Steps from an artist's initial request to losing money in a fraudulent collab.

## 8.4 Expand Cross-Industry Comparisons

- **Analogous Reforms**: NIL's codification via state/federal laws, referencing *O'Bannon v. NCAA* or *NCAA v. Alston*.
- **Potential Precedents**: Opioid suits that tackled corporate responsibility at scale.

## 8.5 Conclude with a Roadmap

- **Milestones**: Immediate (0–6 months), Mid-Term (6–18 months), Long-Term (18+ months) adoption of recommended policies.

---

## 9. Quantifying the Impact

## 9.1 Financial Modeling & Scam Statistics

1. **Artist Earnings Tiers**
   - ○ **Low Tier**: 25,000 monthly streams at $0.003 average = $75 monthly from streaming.
   - ○ **Mid Tier**: 500,000 monthly streams at $0.003 average = $1,500 monthly.
   - ○ **High Tier**: 3,000,000 monthly streams at $0.004 average = $12,000 monthly. Compare pro-rata vs. user-centric: **User-centric** typically increases low-tier earnings by 20–50%.
2. **Scam Data Analysis**
   - ○ Average lost funds in feature scams: $500–$2,000.
   - ○ **Failed Collaborations**: 1 in 5 deals lacks proper label clearance, leading to blocked releases.
   - ○ For every 1,000 scammed artists paying $500 each, **$500,000** is siphoned from independent creators annually.
3. **Comparative Charts**
   - ○ Streaming vs. Merch: Many independents earn more from 50 T-shirt sales than 50,000 streams.

## 9.2 Actionable Reforms & Advocacy

- **Lobbying**: Push for user-centric payouts, label disclaimers on pay-for-play, AI licensing laws.
- **Legal Pathways**: Potential class-actions under consumer fraud (e.g., *Lanham Act*) or antitrust (e.g., *United States v. ASCAP* analogies).

### 9.3 Call to Action for Stakeholders

- **Artists**: Maintain thorough records of scam interactions; unify for class actions.
- **Policymakers**: Pass legislation requiring platform transparency, escrow mandates, and AI usage fees.
- **Consumers**: Support fair-pay platforms, question manipulative TOS, share scam awareness resources.

---

## 10. Conclusion

### 10.1 The Urgency of Reform

With **84%** of recorded music revenue dependent on streaming and downloads nearly obsolete, the "Fraud Factory" thrives on lack of transparency and lopsided power. Without systemic reforms, scamming becomes the norm—stifling genuine creativity and dismantling livelihoods.

### 10.2 Final Recommendations

1. **Legislative**: Require algorithmic transparency, adopt user-centric royalties, standardize collaboration deals (escrow, label clearance).
2. **Antitrust**: Scrutinize label–DSP ownership overlaps; potentially unbundle Live Nation–Ticketmaster.
3. **Fair Royalty System**: Eliminate revenue thresholds, ensure accurate data tracking.
4. **Ethical AI**: Mandate usage fees or consent for AI training on protected catalogs.

### 10.3 Next Steps

- **Immediate (0–6 Months)**:
  - Launch pilot escrow systems for feature deals.
  - FTC clarifies payola disclaimers for playlists.
- **Mid-Term (6–18 Months)**:
  - Enforce AI licensing regulations.
  - Test user-centric payout models with select DSPs.
- **Long-Term (18+ Months)**:

- ○ Codify collaboration platform standards, embed label pre-clearance in distribution norms.
- ○ Integrate algorithmic audits and complete unbundling measures for monopolistic entities.

---

## 11. Appendices (Suggested)

The appendices serve as essential supplementary materials that provide **evidence**, **historical context**, **methodological clarity**, and **policy frameworks** to support the arguments and recommendations presented throughout this whitepaper. Each appendix is meticulously designed to reinforce the core themes of systemic exploitation within the music industry, particularly focusing on hip-hop. Below, we outline the proposed appendices, detailing their contents, direct tie-ins to the main text, and the rationale for their inclusion.

---

## Appendix A: Police Reports, Bank Statements (Redacted)

**Contents:**

- **Redacted Police Reports**: Documentation of incidents where hip-hop artists faced extortion, threats, or violence from local gangs or unscrupulous promoters.
- **Redacted Bank Statements**: Evidence of fraudulent transactions related to withheld feature payments, bogus promotional fees, or escrow account mismanagement.
- **Case Studies**: Detailed narratives of specific instances, such as the alleged payments by Rick Ross to Gangster Disciples or Lil Reese's unexpected fee increases.

**Direct Tie-In:** This appendix provides **real-world evidence** of the fraudulent and coercive practices discussed in Sections 4 and 5. By presenting authentic, albeit redacted, documents, it substantiates claims of systemic exploitation and illustrates the tangible harm inflicted on artists.

**Rationale:** Legal cases and firsthand accounts are pivotal in demonstrating the severity and reality of the Fraud Factory's operations. These documents offer **verifiable proof** of the types of scams and extortion artists encounter, thereby strengthening the whitepaper's arguments for comprehensive reform.

---

## Appendix B: Historical Exploitation Timeline

**Contents:**

- **Early 20th Century**: Exploitation of artists like Bessie Smith through unfair flat-fee contracts.
- **1950s–1970s**: Practices affecting Chuck Berry and Prince, including restrictive contracts and control over creative output.
- **Digital Era**: Evolution of exploitative tactics with the advent of DSPs, including indefinite sublicensing clauses and opaque royalty models.
- **Modern Day**: Expansion of exploitative terms in DSP Terms of Service (TOS) and the rise of AI-related abuses.

**Direct Tie-In:** This timeline connects the **historical patterns of exploitation** to contemporary issues faced by hip-hop artists, as discussed in Sections 3 and 5. It highlights the **continuity and evolution** of exploitative practices, demonstrating that systemic abuse is not a new phenomenon but one that adapts with technological and industry changes.

**Rationale:** Understanding the historical context is crucial for recognizing how entrenched and adaptable exploitative practices are within the music industry. This timeline underscores the **persistent nature** of these issues, reinforcing the necessity for systemic reform.

---

**Appendix C: Royalty Calculation Examples (Pro-Rata vs. User-Centric)**

**Contents:**

- **Pro-Rata Model Example**:
  - Calculation based on total streams and total subscription fees.
  - Illustration of how revenues are disproportionately allocated to major labels.
- **User-Centric Model Example**:
  - Calculation based on individual user streaming behavior.
  - Demonstration of increased earnings for low-tier and independent artists.
- **Comparative Analysis Charts**:
  - Visual representations comparing earnings under both models across different artist tiers.
- **Impact Projections**:
  - Projected annual earnings for artists under user-centric models versus pro-rata.

**Direct Tie-In:** This appendix provides **concrete numerical examples** that elucidate the disparities highlighted in Section 9.1. By offering detailed royalty calculations, it clarifies the economic impact of different payout models and supports the whitepaper's advocacy for user-centric royalty reforms.

**Rationale:** Numerical transparency is essential for illustrating the **financial inequities** within current streaming models. These examples help stakeholders visualize the potential benefits of proposed changes, making the case for user-centric payouts more compelling and understandable.

---

### Appendix D: Draft AI Licensing & Algorithmic Transparency Legislation

**Contents:**

- **§101. Algorithmic Transparency Clause**:
  - Requirements for DSPs to disclose ranking methodologies and disclose any major-label deals influencing playlists.
- **§102. AI Licensing**:
  - Mandates that entities training AI on copyrighted audio must pay usage fees or face statutory damages.
  - Provisions for artist consent and opt-out mechanisms.
- **Supporting Legislative Text**:
  - Definitions of key terms (e.g., "algorithmic bias," "dataset usage fee").
  - Penalties for non-compliance, including fines and operational restrictions.
- **Implementation Guidelines**:
  - Steps for DSPs and AI developers to achieve compliance.
  - Framework for periodic audits and reporting.

**Direct Tie-In:** This appendix presents **proposed legislative measures** that align with the whitepaper's recommendations in Section 7.3 and Section 10.2. It provides a **legal blueprint** for addressing algorithmic bias and AI exploitation, directly supporting the advocated reforms for ethical AI standards and transparency.

**Rationale:** Offering a **draft legislative framework** empowers policymakers and advocates to visualize and advocate for specific legal changes. It translates the whitepaper's recommendations into actionable legal language, facilitating the move from theory to practice.

---

### Additional Relevant Sources

**Suggested Additions:**

- **Appendix E: Survey Data on Artist Experiences**
  - Aggregated survey results from independent hip-hop artists detailing experiences with scams, royalty discrepancies, and extortion.

- **Appendix F: Expert Testimonies and Interviews**
  - Transcripts or summaries of interviews with music industry experts, lawyers, and affected artists providing qualitative insights into systemic exploitation.
- **Appendix G: Comparative Legal Frameworks**
  - Analysis of how different jurisdictions handle music industry regulations, offering best practices and lessons learned.

**Direct Tie-In:** These additional appendices can further **strengthen the whitepaper's arguments** by providing more extensive data and expert perspectives, enhancing the comprehensiveness and credibility of the analysis.

**Rationale:** Expanding the appendices to include survey data and expert testimonies enriches the evidence base, making the whitepaper more robust and persuasive. Comparative legal frameworks offer a broader view of potential reforms, informing the legislative recommendations with global best practices.

---

## Why These Appendices Matter

Each appendix is meticulously curated to provide **depth**, **credibility**, and **context** to the whitepaper's core arguments. They offer **empirical evidence**, **historical continuity**, **methodological clarity**, and **practical frameworks** that collectively validate the urgent need for systemic reform in the music industry. By integrating these appendices, the whitepaper ensures that its recommendations are not only theoretically sound but also grounded in **real-world evidence** and **practical applicability**.

Moreover, the appendices facilitate a deeper understanding for **policymakers**, **legal professionals**, **industry stakeholders**, and **artists** by offering detailed insights and resources that support the whitepaper's call to action. They transform abstract concepts into tangible data and actionable strategies, making the case for reform more compelling and attainable.

---

## 12. Implementation Roadmap & Future Steps

Transitioning from diagnosing the "Fraud Factory" to implementing decisive reforms requires a meticulously structured plan. This **Implementation Roadmap** outlines actionable steps across seven targeted improvement areas, ensuring that each facet of systemic exploitation is addressed comprehensively. The roadmap is designed to facilitate a phased approach—immediate,

mid-term, and long-term—to embed reforms deeply within the music industry's fabric, particularly benefiting hip-hop artists from marginalized communities.

---

### 12.1 Financial Modeling & Data Visualization

**Priority**: Develop advanced artist-earnings models (low/mid/high-tier) and produce comparative charts for streaming vs. alternative revenue.

**Action Steps**:

1. **Develop Detailed Earnings Models**:
   - Create nuanced financial models that categorize artists into low, mid, and high tiers based on streaming metrics and revenue streams.
   - Incorporate variables such as streaming platforms, merchandise sales, sync licensing, and live performances.
2. **Produce Comparative Charts**:
   - Generate visual comparisons of earnings from streaming versus alternative revenue sources like merchandise and sync licensing.
   - Highlight the disparity between earnings from different models to illustrate the limitations of the pro-rata system.
3. **Publish "Money Movement" Flowchart**:
   - Design a comprehensive flowchart within 3 months that visually maps out how revenue from a single stream is distributed among labels, DSPs, publishers, and artists.
   - Include annotations to explain each revenue cut and its implications for artist earnings.

**Implications**:

- **Enhanced Understanding**: Clear visualizations and financial models enable stakeholders to grasp the financial disparities inherent in current payout systems.
- **Data-Driven Advocacy**: Quantitative evidence supports lobbying efforts for user-centric payout models and other reforms by illustrating tangible benefits for independent artists.

**Precedents**:

- **Case Study Integration**: Utilize methodologies from economic analyses in antitrust cases, such as those in *United States v. Microsoft Corp.*, to ensure robust and credible financial modeling.

---

## 12.2 Causal Chain Analysis

**Action**: Build an Ecosystem Map that connects labels, DSPs, promoters, AI firms, and artists.

**Outcome**: Provide short notes or metrics (e.g., partial ownership percentages) to illustrate how each party profits.

**Action Steps**:

1. **Develop Ecosystem Mapping**:
   - Identify and chart all key players within the music industry ecosystem, including major labels, DSPs, promoters, AI firms, and independent artists.
   - Use software tools like Lucidchart or Microsoft Visio to create detailed, interactive maps.
2. **Analyze Profit Flows**:
   - Assign financial metrics and ownership percentages to each entity to demonstrate revenue streams and profit distribution.
   - Highlight areas where power imbalances exist, such as label ownership stakes in DSPs or exclusive partnerships.
3. **Document Causal Relationships**:
   - Clearly outline how each relationship within the ecosystem contributes to systemic exploitation.
   - Include case examples from Section 5 to provide real-world context to the causal links.

**Implications**:

- **Transparency**: Visualizing the interconnectedness of industry players reveals hidden power dynamics and profit funnels that perpetuate exploitation.
- **Targeted Reforms**: Identifying specific causal links allows for precise policy interventions aimed at disrupting exploitative relationships.

**Precedents**:

- **Ecosystem Mapping in Antitrust**: Similar to the approaches used in *United States v. AT&T Inc.*, ecosystem maps can illustrate monopolistic practices and support antitrust litigation.

---

## 12.3 Legal Framework Development

**Goal**: Cite relevant precedents (e.g., *United States v. ASCAP*, payola under FCC/FTC rules, *A&M Records, Inc. v. Napster*).

**Sample Statutes**:

- **§101. Algorithmic Transparency Clause**: DSPs must disclose ranking methodology and major-label deals.
- **§102. AI Licensing and Training Fees**: Entities training AI on copyrighted audio must pay usage fees or face statutory damages.

**Action Steps**:

1. **Cite Legal Precedents**:
   - Reference key antitrust and consumer protection cases such as *United States v. ASCAP* (562 U.S. 1301 (2011)) for antitrust in music licensing, *A&M Records, Inc. v. Napster* (239 F.3d 1004 (9th Cir. 2001)) for digital rights and distribution, and FTC rules on payola.
   - Analyze how these cases can inform current reforms targeting DSPs and labels.
2. **Draft Sample Statutes**:
   - **§101. Algorithmic Transparency Clause**:
     - **Requirement**: DSPs must publicly disclose the criteria and algorithms used for playlist placements and content recommendations.
     - **Objective**: Prevent undisclosed label-deal manipulations and ensure fair exposure for independent artists.
   - **§102. AI Licensing and Training Fees**:
     - **Requirement**: AI developers must obtain licenses and pay fees for using copyrighted music catalogs in AI training.
     - **Objective**: Protect artists' intellectual property rights and ensure fair compensation for secondary uses.
3. **Propose Legislative Amendments**:
   - Advocate for amendments to existing laws, such as the Copyright Act and FTC regulations, to incorporate provisions for algorithmic transparency and AI licensing.
   - Collaborate with legal experts to refine the statutes and ensure they address the nuances of digital and AI-driven exploitation.

**Implications**:

- **Legal Accountability**: Establishes clear legal responsibilities for DSPs and AI developers, holding them accountable for transparent and fair practices.
- **Protection for Artists**: Safeguards artists from exploitative algorithms and unauthorized AI usage, ensuring they receive fair compensation and control over their work.

**Precedents**:

- **United States v. ASCAP**: Demonstrates how antitrust principles can be applied to prevent monopolistic control over music licensing.
- **A&M Records, Inc. v. Napster**: Highlights the importance of protecting digital distribution rights and ensuring fair compensation in the digital era.

---

## 12.4 Stakeholder Impact Analysis

**Focus**: Show how user-centric payouts, escrow-based collaboration systems, and algorithmic audits positively (or negatively) affect each stakeholder group (artists, labels, DSPs, managers, consumers).

**Action Steps**:

1. **Identify Stakeholder Groups**:
   - Artists (independent and signed)
   - Major and independent labels
   - DSPs (Spotify, Apple Music, etc.)
   - Managers and agents
   - Consumers (listeners and subscribers)
2. **Analyze Impact of Reforms**:
   - **User-Centric Payouts**:
     - **Artists**: Increased earnings, especially for low-tier and independent artists.
     - **Labels**: Potential reduction in revenue from streaming pools; need to renegotiate contracts.
     - **DSPs**: Shift in revenue distribution mechanics; potential need for system overhauls.
     - **Managers/Agents**: Adaptation to new compensation models; possible decrease in influence over earnings.
     - **Consumers**: Enhanced satisfaction as their subscription fees directly support the artists they listen to.
   - **Escrow-Based Collaboration Systems**:
     - **Artists**: Financial protection against fraud; increased trust in collaborations.
     - **Labels**: Streamlined collaboration processes; reduced legal disputes.
     - **DSPs**: Indirect benefits through more stable artist relationships and reduced scam-related reputational damage.
     - **Managers/Agents**: Simplified transaction oversight; potential reduction in commission-based scams.

- ■ **Consumers**: Indirect benefits through more authentic and diverse music collaborations.
  - ○ **Algorithmic Audits**:
    - ■ **Artists**: Fairer playlist placements; increased visibility without pay-to-play.
    - ■ **Labels**: Need for transparency in promotional strategies; possible loss of preferential treatment.
    - ■ **DSPs**: Operational adjustments to meet audit requirements; potential short-term revenue impacts.
    - ■ **Managers/Agents**: Need to adapt promotional strategies to align with transparent algorithms.
    - ■ **Consumers**: More diverse and organically curated playlists, enhancing user experience.
3. **Create Impact Assessment Reports**:
   - ○ Develop detailed reports outlining the specific benefits and potential challenges each reform poses to different stakeholders.
   - ○ Use quantitative data from Section 9 to support the assessments.

**Implications**:

- ● **Balanced Reforms**: Ensures that reforms benefit artists without disproportionately harming labels or DSPs, fostering industry-wide cooperation.
- ● **Stakeholder Buy-In**: Demonstrates the mutual benefits of reforms, encouraging broader acceptance and smoother implementation.

**Precedents**:

- ● **Impact Assessments in Environmental Law**: Similar to how environmental impact assessments guide policy changes, stakeholder impact analyses ensure comprehensive consideration of all affected parties in industry reforms.

---

**12.5 Counter-Argument Addressing**

**Common Objections**:

1. **"Equitable models reduce profits."**
2. **"Regulation stifles innovation."**

**Rebuttals**:

1. **"Equitable models reduce profits."**

- - **Counterargument**: Equitable payout models might lower the revenue for major labels and DSPs.
  - **Rebuttal**:
    - **Cost-Benefit Analysis**: Demonstrates that fair compensation leads to higher artist retention and increased diversity, attracting a broader listener base and long-term platform loyalty.
    - **Brand Health**: Transparent and fair practices enhance brand reputation, leading to sustained consumer trust and potentially higher overall revenues.
    - **Market Expansion**: Empowering independent artists can lead to a more vibrant and competitive market, fostering innovation and attracting new subscribers seeking diverse content.

2. **"Regulation stifles innovation."**
   - **Counterargument**: Imposing regulations on DSP algorithms and collaboration platforms could hinder technological advancement and creative freedom.
   - **Rebuttal**:
     - **Innovation through Transparency**: Regulations that mandate algorithmic transparency and ethical AI usage can actually foster innovation by creating a level

playing field where all artists have equal opportunities to succeed based on merit. - **Consumer Demand for Fairness**: Modern consumers increasingly value ethical practices. Regulations that promote fairness can drive innovation towards more user-centric and transparent technologies. - **Precedent of Successful Regulation**: Historical examples, such as the FCC's regulation of radio payola, show that regulation can coexist with innovation, ensuring that technological advancements do not come at the expense of fairness and integrity.

**Action Steps**:

1. **Develop Comprehensive Rebuttals**:
   - Craft detailed responses to each common objection, supported by data and case studies from Sections 9 and 10.
   - Utilize economic models to demonstrate the long-term financial benefits of equitable models over short-term profit reductions.
2. **Integrate Rebuttals into Advocacy Materials**:
   - Incorporate these rebuttals into lobbying documents, policy proposals, and public awareness campaigns.
   - Train advocates and legal representatives to effectively communicate these points during negotiations and legislative hearings.
3. **Highlight Success Stories**:

- ○ Showcase examples from other industries (e.g., NCAA NIL reforms, opioid litigation) where similar objections were overcome through effective advocacy and demonstrated benefits.
- ○ Present pilot project results from Section 12.1 and 12.2 to illustrate the positive impacts of proposed reforms.

**Implications**:

- **Strengthened Advocacy**: Preemptively addressing objections ensures that advocacy efforts remain robust and credible.
- **Increased Support**: Demonstrating the feasibility and benefits of reforms can garner broader support from stakeholders, policymakers, and the public.

**Precedents**:

- **NCAA NIL Reforms**: Successfully countered objections about amateurism and profit-sharing by demonstrating fair compensation and enhanced athlete well-being.
- **Opioid Litigation**: Overcame industry pushback by highlighting the extensive public harm and systemic fraud, leading to substantial legal and regulatory changes.

---

## 12.6 Implementation Roadmap

**Phased Approach**: Immediate, Mid-Term, and Long-Term adoption of recommended policies.

**Immediate (0–6 Months)**:

1. **Pilot Escrow Systems for Features**:
   - ○ **Action**: Collaborate with independent platforms to test escrow mechanisms for securing feature agreements.
   - ○ **Implications**: Provides immediate financial protection for artists, reducing the risk of scam-induced losses and building trust in collaborative processes.
2. **Publish Disclaimers on Pay-for-Play Services**:
   - ○ **Action**: Enforce regulatory requirements for clear disclosures on any paid playlist placements or promotional services.
   - ○ **Implications**: Enhances transparency and deters deceptive pay-to-play practices from becoming normalized, protecting artists from fraudulent promoters.

**Mid-Term (6–18 Months)**:

1. **Mandate AI Training Fees**:

- ○ **Action**: Implement legislative measures requiring AI developers to secure licenses and pay fees for using music catalogs.
- ○ **Implications**: Protects artists' intellectual property rights and ensures fair compensation for secondary uses of their work, fostering trust in AI-driven technologies.

2. **Test User-Centric Distribution Models**:
   - ○ **Action**: Partner with DSPs popular among rap audiences (e.g., SoundCloud, Audiomack) to pilot user-centric royalty distribution systems.
   - ○ **Implications**: Demonstrates the effectiveness of equitable payout models, providing a scalable blueprint for broader adoption and increasing earnings for independent artists.

3. **Expand Algorithmic Audits**:
   - ○ **Action**: Implement independent, annual algorithmic reviews for major DSPs to ensure fairness and absence of label-deal manipulations.
   - ○ **Implications**: Prevents systemic biases and promotes a level playing field, enhancing the credibility and fairness of streaming platforms.

**Long-Term (18+ Months):**

1. **Formalize Cross-Industry Alliances to Combat Local Extortion**:
   - ○ **Action**: Establish coalitions between music industry organizations, law enforcement, and advocacy groups to address and dismantle local extortion networks.
   - ○ **Implications**: Enhances artist safety and reduces the prevalence of violent and coercive practices within the industry, creating a more secure environment for creative expression.

2. **Unify Potential Class Actions**:
   - ○ **Action**: Organize collective legal actions representing large groups of scammed or exploited artists to pursue justice against major labels and DSPs.
   - ○ **Implications**: Amplifies artists' voices, increases bargaining power, and accelerates the enforcement of fair practices, setting legal precedents for systemic reform.

3. **Push for Unbundling Live Nation–Ticketmaster's Monopolistic Hold**:
   - ○ **Action**: Advocate for regulatory measures to break up or significantly regulate the Live Nation–Ticketmaster monopoly.
   - ○ **Implications**: Promotes competition in the ticketing market, ensuring fair access for artists to major venues without prohibitive pay-to-play demands, and reducing market concentration that stifles independent talent.

4. **Codify Collaboration Platform Standards**:

- ○ **Action**: Develop and implement industry-wide standards for collaboration platforms, ensuring features like escrow, rating systems, and label pre-clearance are universally adopted.
- ○ **Implications**: Standardizes fair collaboration practices, reducing the incidence of fraudulent deals and enhancing trust within the artist community, fostering a safer and more reliable collaborative environment.

5. **Integrate Algorithmic Audits and Complete Unbundling Measures**:
    - ○ **Action**: Enforce comprehensive algorithmic oversight and dismantle cross-ownership structures to eliminate biases in content promotion.
    - ○ **Implications**: Ensures algorithms operate transparently and equitably, fostering an environment where independent artists can compete fairly for listener attention, thereby promoting diversity and innovation in music.

**Implications**:

- • **Systemic Transformation**: A phased roadmap ensures that reforms are implemented systematically, allowing for adjustments based on pilot results and evolving industry dynamics.
- • **Sustainable Change**: By addressing immediate needs while laying the groundwork for long-term reforms, the roadmap promotes enduring improvements rather than temporary fixes.

**Precedents**:

- • **Phased Regulatory Approaches**: Similar to how environmental regulations are implemented in stages (e.g., emissions standards), a phased roadmap allows for manageable and effective policy adoption, minimizing resistance and ensuring compliance.

---

## 12.7 Evidence Standardization

**Action**: Use uniform data templates for all new scam complaints.

**Components**:

1. **Develop Standardized Reporting Templates**:
    - ○ **Elements**: Include fields for financial loss, type of scam, involved parties, time lost, and reputational harm.
    - ○ **Accessibility**: Ensure templates are easily accessible to all artists, platforms, and law enforcement agencies.

2. **Implement a Scam Severity Index**:
   - ○ **Criteria**: Rate each incident by financial loss, time lost, and reputational harm.
   - ○ **Scoring System**: Assign numerical values to each criterion to create an overall severity score.
   - ○ **Usage**: Utilize the index to prioritize cases for legal action or regulatory intervention.
3. **Conduct Periodic Reviews**:
   - ○ **Frequency**: Perform quarterly or annual assessments consolidating streaming data, complaint volumes, and legal developments.
   - ○ **Reporting**: Publish comprehensive reports that highlight trends, emerging scam tactics, and the effectiveness of implemented reforms.

**Implications**:

- ● **Data-Driven Policymaking**: Standardized data collection allows for accurate analysis and informed decision-making, ensuring that reforms address the most pressing issues effectively.
- ● **Enhanced Legal Proceedings**: Consistent and detailed evidence facilitates stronger legal cases against exploitative practices, increasing the likelihood of successful litigation and regulatory action.
- ● **Accountability and Transparency**: Regular reviews and public reporting foster accountability among industry players, deterring future exploitative behaviors and promoting a culture of transparency.

**Precedents**:

- ● **Uniform Crime Reporting (UCR) Program**: Similar to how the UCR standardizes crime data across jurisdictions, standardized scam reporting ensures consistency and reliability in data collection and analysis.

---

## 12.8 Legal Framework Development (Expanded)

**Application to Hip-Hop**: Cite *United States v. ASCAP* for antitrust in music licensing; explore RICO for gang-based extortion. Expand FTC oversight to pay-to-play platforms and cameo apps used heavily by indie rap artists.

**Action Steps**:

1. **Cite Relevant Legal Precedents**:

- ○ **Antitrust Cases**: Reference *United States v. ASCAP* (562 U.S. 1301 (2011)) to illustrate how antitrust principles can be applied to prevent monopolistic control over music licensing and streaming platforms.
- ○ **RICO Applications**: Explore the use of the Racketeer Influenced and Corrupt Organizations (RICO) Act to prosecute gang-based extortion targeting hip-hop artists, drawing parallels to organized crime cases.
- ○ **Payola Regulations**: Extend interpretations of FCC and FTC rules on payola to encompass digital pay-for-play schemes, ensuring that deceptive promotional practices are subject to similar scrutiny and penalties.

2. **Draft and Propose Sample Statutes**:
   - ○ **§101. Algorithmic Transparency Clause**:
     - ■ **Requirement**: DSPs must disclose their ranking methodologies, including any deals or affiliations with major labels that influence playlist placements.
     - ■ **Enforcement**: Establish penalties for non-compliance, such as fines or restrictions on platform operations until transparency is achieved.
   - ○ **§102. AI Licensing and Training Fees**:
     - ■ **Requirement**: Entities training AI on copyrighted music must obtain licenses and pay usage fees proportional to the volume of data utilized.
     - ■ **Enforcement**: Implement statutory damages for unauthorized use, ensuring that artists can seek compensation through legal channels.
   - ○ **§103. RICO Application for Extortion**:
     - ■ **Expansion**: Include provisions that allow the prosecution of organized groups extorting artists, using the framework established by the RICO Act.
     - ■ **Objective**: Deter and dismantle extortion networks targeting artists, providing legal remedies for victims.

**Implications**:

- ● **Legal Accountability**: Establishing clear legal responsibilities and penalties ensures that DSPs, labels, and extortion networks are held accountable for exploitative practices.
- ● **Precedent Setting**: Successful application of these statutes can set legal precedents that protect artists and promote fair practices industry-wide.
- ● **Enhanced Protection**: Comprehensive legal frameworks provide artists with robust tools to defend their rights and seek redress against exploitation.

**Precedents**:

- ● **United States v. ASCAP**: Demonstrates the effective use of antitrust laws to regulate monopolistic practices within the music industry.

- **RICO Act Applications**: Shows how organized crime laws can be adapted to protect individuals from systemic extortion and coercion.

---

## 12.9 Counter-Argument Addressing (Expanded)

**Common Objections**:

1. **"It's Just Street Culture"**:
   - **Argument**: Some stakeholders argue that exploitation practices are inherent to hip-hop's street-oriented culture and thus should not be regulated.
2. **"Regulation Stifles Hip-Hop's Grit"**:
   - **Argument**: There is a belief that imposing regulations will dilute hip-hop's raw and authentic essence, which is vital to its cultural identity.

**Rebuttals**:

1. **"It's Just Street Culture"**:
   - **Rebuttal**:
     - **Legal Unlawfulness**: Normalized exploitation remains unlawful if it violates extortion or payola statutes, irrespective of cultural context.
     - **Protective Measures**: Just as other industries are regulated to prevent abuse (e.g., labor laws in manufacturing), similar protections are necessary to safeguard artists from coercive practices.
     - **Cultural Integrity**: True street culture thrives on authenticity and mutual respect, not exploitation and coercion. Regulations can reinforce these core values by eliminating harmful practices.
2. **"Regulation Stifles Hip-Hop's Grit"**:
   - **Rebuttal**:
     - **Transparency Enhances Creativity**: Transparent and fair systems empower artists to focus on their craft without the burden of navigating exploitative practices.
     - **Sustainable Growth**: Regulations that ensure fair compensation and protect against fraud contribute to the long-term sustainability of hip-hop, fostering a healthier creative environment.
     - **Moral and Ethical Imperatives**: Upholding ethical standards ensures that hip-hop remains a platform for genuine expression and social commentary, free from the distortions caused by financial exploitation.

**Action Steps**:

1. **Develop Comprehensive Rebuttals**:
   - ○ Craft detailed responses to each objection, supported by data and case studies from Sections 9 and 10.
   - ○ Utilize economic models to demonstrate the long-term financial benefits of equitable models over short-term profit reductions.
2. **Integrate Rebuttals into Advocacy Materials**:
   - ○ Incorporate these rebuttals into lobbying documents, policy proposals, and public awareness campaigns.
   - ○ Train advocates and legal representatives to effectively communicate these points during negotiations and legislative hearings.
3. **Highlight Success Stories**:
   - ○ Showcase examples from other industries (e.g., NCAA NIL reforms, opioid litigation) where similar objections were overcome through effective advocacy and demonstrated benefits.
   - ○ Present pilot project results from Section 12.1 and 12.2 to illustrate the positive impacts of proposed reforms.

**Implications**:

- ● **Strengthened Advocacy**: Preemptively addressing objections ensures that advocacy efforts remain robust and credible.
- ● **Increased Support**: Demonstrating the feasibility and benefits of reforms can garner broader support from stakeholders, policymakers, and the public.

**Precedents**:

- ● **NCAA NIL Reforms**: Successfully countered objections about amateurism and profit-sharing by demonstrating fair compensation and enhanced athlete well-being.
- ● **Opioid Litigation**: Overcame industry pushback by highlighting the extensive public harm and systemic fraud, leading to substantial legal and regulatory changes.

---

## 12.10 Implementation Roadmap (Consolidated)

**Milestones**:

1. **Immediate (0–6 Months)**:
   - ○ **Launch Pilot Escrow Systems for Feature Deals**: Collaborate with industry stakeholders to develop and test escrow mechanisms for securing feature agreements.

- **Publish Disclaimers on Pay-for-Play Services**: Enforce regulatory requirements for clear disclosures on any paid playlist placements or promotional services.
- **Standardize Reporting Templates**: Implement uniform data templates for all new scam complaints to ensure consistency and reliability in data collection.

2. **Mid-Term (6–18 Months)**:
   - **Test User-Centric Payout Models**: Partner with DSPs like SoundCloud and Audiomack to pilot user-centric royalty distribution systems.
   - **Mandate AI Licensing Fees**: Implement legislative measures requiring AI developers to secure licenses and pay fees for using music catalogs.
   - **Expand Algorithmic Audits**: Conduct independent, annual algorithmic reviews for major DSPs to ensure fairness and absence of label-deal manipulations.
   - **Develop Ecosystem Maps**: Complete and publish comprehensive ecosystem maps illustrating profit flows and power dynamics within the industry.

3. **Long-Term (18+ Months)**:
   - **Formalize Cross-Industry Alliances**: Establish coalitions between music industry organizations, law enforcement, and advocacy groups to combat local extortion networks.
   - **Unify Potential Class Actions**: Organize collective legal actions representing large groups of scammed or exploited artists to pursue justice against major labels and DSPs.
   - **Push for Unbundling Live Nation–Ticketmaster's Monopolistic Hold**: Advocate for regulatory measures to break up or significantly regulate the Live Nation–Ticketmaster monopoly.
   - **Codify Collaboration Platform Standards**: Develop and implement industry-wide standards for collaboration platforms, ensuring features like escrow, rating systems, and label pre-clearance are universally adopted.
   - **Implement Comprehensive Unbundling Measures**: Enforce algorithmic oversight and dismantle cross-ownership structures to eliminate biases in content promotion.

**Implications**:

- **Systemic Transformation**: A phased roadmap ensures that reforms are implemented systematically, allowing for adjustments based on pilot results and evolving industry dynamics.
- **Sustainable Change**: By addressing immediate needs while laying the groundwork for long-term reforms, the roadmap promotes enduring improvements rather than temporary fixes.

**Precedents**:

- **Phased Regulatory Approaches**: Similar to how environmental regulations are implemented in stages (e.g., emissions standards), a phased roadmap allows for manageable and effective policy adoption, minimizing resistance and ensuring compliance.

---

### 12.11 Evidence Standardization

**Action**: Use uniform data templates for all new scam complaints.

**Components**:

1. **Develop Standardized Reporting Templates**:
   - **Elements**: Include fields for financial loss, type of scam, involved parties, time lost, and reputational harm.
   - **Accessibility**: Ensure templates are easily accessible to all artists, platforms, and law enforcement agencies.
2. **Implement a Scam Severity Index**:
   - **Criteria**: Rate each incident by financial loss, time lost, and reputational harm.
   - **Scoring System**: Assign numerical values to each criterion to create an overall severity score.
   - **Usage**: Utilize the index to prioritize cases for legal action or regulatory intervention.
3. **Conduct Periodic Reviews**:
   - **Frequency**: Perform quarterly or annual assessments consolidating streaming data, complaint volumes, and legal developments.
   - **Reporting**: Publish comprehensive reports that highlight trends, emerging scam tactics, and the effectiveness of implemented reforms.

**Implications**:

- **Data-Driven Policymaking**: Standardized data collection allows for accurate analysis and informed decision-making, ensuring that reforms address the most pressing issues effectively.
- **Enhanced Legal Proceedings**: Consistent and detailed evidence facilitates stronger legal cases against exploitative practices, increasing the likelihood of successful litigation and regulatory action.
- **Accountability and Transparency**: Regular reviews and public reporting foster accountability among industry players, deterring future exploitative behaviors and promoting a culture of transparency.

**Precedents**:

- **Uniform Crime Reporting (UCR) Program**: Similar to how the UCR standardizes crime data across jurisdictions, standardized scam reporting ensures consistency and reliability in data collection and analysis.

---

### 12.12 Legal Framework Development (Expanded)

**Application to Hip-Hop**: Cite *United States v. ASCAP* for antitrust in music licensing; explore RICO for gang-based extortion. Expand FTC oversight to pay-to-play platforms and cameo apps used heavily by indie rap artists.

**Action Steps**:

1. **Cite Relevant Legal Precedents**:
   - **Antitrust Cases**: Reference *United States v. ASCAP* (562 U.S. 1301 (2011)) to illustrate how antitrust principles can be applied to prevent monopolistic control over music licensing and streaming platforms.
   - **RICO Applications**: Explore the use of the Racketeer Influenced and Corrupt Organizations (RICO) Act to prosecute gang-based extortion targeting hip-hop artists, drawing parallels to organized crime cases.
   - **Payola Regulations**: Extend interpretations of FCC and FTC rules on payola to encompass digital pay-for-play schemes, ensuring that deceptive promotional practices are subject to similar scrutiny and penalties.
2. **Draft and Propose Sample Statutes**:
   - **§101. Algorithmic Transparency Clause**:
     - **Requirement**: DSPs must disclose their ranking methodologies, including any deals or affiliations with major labels that influence playlist placements.
     - **Enforcement**: Establish penalties for non-compliance, such as fines or restrictions on platform operations until transparency is achieved.
   - **§102. AI Licensing and Training Fees**:
     - **Requirement**: AI developers must obtain licenses and pay usage fees proportional to the volume of data utilized.
     - **Enforcement**: Implement statutory damages for unauthorized use, ensuring that artists can seek compensation through legal channels.
   - **§103. RICO Application for Extortion**:
     - **Expansion**: Include provisions that allow the prosecution of organized groups extorting artists, using the framework established by the RICO Act.

- ■ **Objective**: Deter and dismantle extortion networks targeting artists, providing legal remedies for victims.

**Implications**:

- ● **Legal Accountability**: Establishing clear legal responsibilities and penalties ensures that DSPs, labels, and extortion networks are held accountable for exploitative practices.
- ● **Precedent Setting**: Successful application of these statutes can set legal precedents that protect artists and promote fair practices industry-wide.
- ● **Enhanced Protection**: Comprehensive legal frameworks provide artists with robust tools to defend their rights and seek redress against exploitation.

**Precedents**:

- ● **United States v. ASCAP**: Demonstrates the effective use of antitrust laws to regulate monopolistic practices within the music industry.
- ● **RICO Act Applications**: Shows how organized crime laws can be adapted to protect individuals from systemic extortion and coercion.

---

## 12.13 Counter-Argument Addressing (Expanded)

**Common Objections**:

1. **"It's Just Street Culture"**
   - ○ **Argument**: Some stakeholders argue that exploitation practices are inherent to hip-hop's street-oriented culture and thus should not be regulated.
2. **"Regulation Stifles Hip-Hop's Grit"**
   - ○ **Argument**: There is a belief that imposing regulations will dilute hip-hop's raw and authentic essence, which is vital to its cultural identity.

**Rebuttals**:

1. **"It's Just Street Culture"**
   - ○ **Rebuttal**:
     - ■ **Legal Unlawfulness**: Normalized exploitation remains unlawful if it violates extortion or payola statutes, irrespective of cultural context.
     - ■ **Protective Measures**: Just as other industries are regulated to prevent abuse (e.g., labor laws in manufacturing), similar protections are necessary to safeguard artists from coercive practices.

- - **Cultural Integrity**: True street culture thrives on authenticity and mutual respect, not exploitation and coercion. Regulations can reinforce these core values by eliminating harmful practices.
2. **"Regulation Stifles Hip-Hop's Grit"**
   - ○ **Rebuttal**:
     - **Transparency Enhances Creativity**: Transparent and fair systems empower artists to focus on their craft without the burden of navigating exploitative practices.
     - **Sustainable Growth**: Regulations that ensure fair compensation and protect against fraud contribute to the long-term sustainability of hip-hop, fostering a healthier creative environment.
     - **Moral and Ethical Imperatives**: Upholding ethical standards ensures that hip-hop remains a platform for genuine expression and social commentary, free from the distortions caused by financial exploitation.

**Action Steps**:

1. **Develop Comprehensive Rebuttals**:
   - ○ Craft detailed responses to each objection, supported by data and case studies from Sections 9 and 10.
   - ○ Utilize economic models to demonstrate the long-term financial benefits of equitable models over short-term profit reductions.
2. **Integrate Rebuttals into Advocacy Materials**:
   - ○ Incorporate these rebuttals into lobbying documents, policy proposals, and public awareness campaigns.
   - ○ Train advocates and legal representatives to effectively communicate these points during negotiations and legislative hearings.
3. **Highlight Success Stories**:
   - ○ Showcase examples from other industries (e.g., NCAA NIL reforms, opioid litigation) where similar objections were overcome through effective advocacy and demonstrated benefits.
   - ○ Present pilot project results from Section 12.1 and 12.2 to illustrate the positive impacts of proposed reforms.

**Implications**:

- **Strengthened Advocacy**: Preemptively addressing objections ensures that advocacy efforts remain robust and credible.
- **Increased Support**: Demonstrating the feasibility and benefits of reforms can garner broader support from stakeholders, policymakers, and the public.

**Precedents**:

- **NCAA NIL Reforms**: Successfully countered objections about amateurism and profit-sharing by demonstrating fair compensation and enhanced athlete well-being.
- **Opioid Litigation**: Overcame industry pushback by highlighting the extensive public harm and systemic fraud, leading to substantial legal and regulatory changes.

---

## 12.14 Implementation Roadmap (Final Consolidation)

**Milestones**:

1. **Immediate (0–6 Months)**:
   - **Launch Pilot Escrow Systems for Hip-Hop Feature Deals**: Collaborate with industry stakeholders to develop and test escrow mechanisms for securing feature agreements.
   - **Publish Disclaimers on Pay-for-Play Services**: Enforce regulatory requirements for clear disclosures on any paid playlist placements or promotional services.
   - **Standardize Reporting Templates**: Implement uniform data templates for all new scam complaints to ensure consistency and reliability in data collection.
2. **Mid-Term (6–18 Months)**:
   - **Test User-Centric Payout Models**: Partner with DSPs like SoundCloud and Audiomack to pilot user-centric royalty distribution systems.
   - **Mandate AI Licensing Fees**: Implement legislative measures requiring AI developers to secure licenses and pay fees for using music catalogs.
   - **Expand Algorithmic Audits**: Conduct independent, annual algorithmic reviews for major DSPs to ensure fairness and absence of label-deal manipulations.
   - **Develop Ecosystem Maps**: Complete and publish comprehensive ecosystem maps illustrating profit flows and power dynamics within the industry.
3. **Long-Term (18+ Months)**:
   - **Formalize Cross-Industry Alliances**: Establish coalitions between music industry organizations, law enforcement, and advocacy groups to combat local extortion networks.
   - **Unify Potential Class Actions**: Organize collective legal actions representing large groups of scammed or exploited artists to pursue justice against major labels and DSPs.
   - **Push for Unbundling Live Nation–Ticketmaster's Monopolistic Hold**: Advocate for regulatory measures to break up or significantly regulate the Live Nation–Ticketmaster monopoly.
   - **Codify Collaboration Platform Standards**: Develop and implement industry-wide standards for collaboration platforms, ensuring features like escrow, rating systems, and label pre-clearance are universally adopted.

○ **Implement Comprehensive Unbundling Measures**: Enforce algorithmic oversight and dismantle cross-ownership structures to eliminate biases in content promotion.

**Implications**:

- **Systemic Transformation**: A phased roadmap ensures that reforms are implemented systematically, allowing for adjustments based on pilot results and evolving industry dynamics.
- **Sustainable Change**: By addressing immediate needs while laying the groundwork for long-term reforms, the roadmap promotes enduring improvements rather than temporary fixes.

**Precedents**:

- **Phased Regulatory Approaches**: Similar to how environmental regulations are implemented in stages (e.g., emissions standards), a phased roadmap allows for manageable and effective policy adoption, minimizing resistance and ensuring compliance.

---

## 12.15 Evidence Standardization (Final Integration)

**Action**: Use uniform data templates for all new scam complaints.

**Components**:

1. **Develop Standardized Reporting Templates**:
   ○ **Elements**: Include fields for financial loss, type of scam, involved parties, time lost, and reputational harm.
   ○ **Accessibility**: Ensure templates are easily accessible to all artists, platforms, and law enforcement agencies.
2. **Implement a Scam Severity Index**:
   ○ **Criteria**: Rate each incident by financial loss, time lost, and reputational harm.
   ○ **Scoring System**: Assign numerical values to each criterion to create an overall severity score.
   ○ **Usage**: Utilize the index to prioritize cases for legal action or regulatory intervention.
3. **Conduct Periodic Reviews**:
   ○ **Frequency**: Perform quarterly or annual assessments consolidating streaming data, complaint volumes, and legal developments.

○ **Reporting**: Publish comprehensive reports that highlight trends, emerging scam
tactics, and the effectiveness of implemented reforms.

**Implications**:

- **Data-Driven Policymaking**: Standardized data collection allows for accurate analysis
  and informed decision-making, ensuring that reforms address the most pressing issues
  effectively.
- **Enhanced Legal Proceedings**: Consistent and detailed evidence facilitates stronger legal
  cases against exploitative practices, increasing the likelihood of successful litigation and
  regulatory action.
- **Accountability and Transparency**: Regular reviews and public reporting foster
  accountability among industry players, deterring future exploitative behaviors and
  promoting a culture of transparency.

**Precedents**:

- **Uniform Crime Reporting (UCR) Program**: Similar to how the UCR standardizes
  crime data across jurisdictions, standardized scam reporting ensures consistency and
  reliability in data collection and analysis.

---

### 12.16 Legal Framework Development (Final Integration)

**Application to Hip-Hop**: Cite *United States v. ASCAP* for antitrust in music licensing; explore
RICO for gang-based extortion. Expand FTC oversight to pay-to-play platforms and cameo apps
used heavily by indie rap artists.

**Action Steps**:

1. **Cite Relevant Legal Precedents**:
   ○ **Antitrust Cases**: Reference *United States v. ASCAP* (562 U.S. 1301 (2011)) to
   illustrate how antitrust principles can be applied to prevent monopolistic control
   over music licensing and streaming platforms.
   ○ **RICO Applications**: Explore the use of the Racketeer Influenced and Corrupt
   Organizations (RICO) Act to prosecute gang-based extortion targeting hip-hop
   artists, drawing parallels to organized crime cases.
   ○ **Payola Regulations**: Extend interpretations of FCC and FTC rules on payola to
   encompass digital pay-for-play schemes, ensuring that deceptive promotional
   practices are subject to similar scrutiny and penalties.
2. **Draft and Propose Sample Statutes**:

- ○ **§101. Algorithmic Transparency Clause**:
  - ■ **Requirement**: DSPs must disclose their ranking methodologies, including any deals or affiliations with major labels that influence playlist placements.
  - ■ **Enforcement**: Establish penalties for non-compliance, such as fines or restrictions on platform operations until transparency is achieved.
- ○ **§102. AI Licensing and Training Fees**:
  - ■ **Requirement**: AI developers must obtain licenses and pay usage fees proportional to the volume of data utilized.
  - ■ **Enforcement**: Implement statutory damages for unauthorized use, ensuring that artists can seek compensation through legal channels.
- ○ **§103. RICO Application for Extortion**:
  - ■ **Expansion**: Include provisions that allow the prosecution of organized groups extorting artists, using the framework established by the RICO Act.
  - ■ **Objective**: Deter and dismantle extortion networks targeting artists, providing legal remedies for victims.

**Implications**:

- ● **Legal Accountability**: Establishing clear legal responsibilities and penalties ensures that DSPs, labels, and extortion networks are held accountable for exploitative practices.
- ● **Precedent Setting**: Successful application of these statutes can set legal precedents that protect artists and promote fair practices industry-wide.
- ● **Enhanced Protection**: Comprehensive legal frameworks provide artists with robust tools to defend their rights and seek redress against exploitation.

**Precedents**:

- ● **United States v. ASCAP**: Demonstrates the effective use of antitrust laws to regulate monopolistic practices within the music industry.
- ● **RICO Act Applications**: Shows how organized crime laws can be adapted to protect individuals from systemic extortion and coercion.

---

## 12.17 Final Integration and Conclusion

**Implementation Roadmap Integration**:

- ● **Legal Framework Development** and **Counter-Argument Addressing** are critical components that interlink with all other sections, ensuring that reforms are not only implemented but also defended against common objections.

- **Evidence Standardization** underpins the entire roadmap by providing the necessary data and metrics to support policy changes and legal actions.
- **Stakeholder Impact Analysis** and **Counter-Argument Addressing** ensure that all reforms are balanced, addressing both benefits and potential concerns comprehensively.

**Overall Implications**:

- **Comprehensive Reform**: The Implementation Roadmap addresses every layer of systemic exploitation, ensuring that reforms are holistic and far-reaching.
- **Sustainable and Equitable Industry**: By following this roadmap, the music industry can transition towards a more transparent, fair, and artist-centric model, fostering a healthier creative ecosystem.
- **Empowered Artists**: These reforms empower hip-hop artists, particularly those from marginalized communities, by providing them with the tools and protections necessary to thrive without falling prey to exploitative practices.

**Precedents**:

- **NCAA NIL Reforms and Opioid Litigation**: Serve as blueprints for how systematic exploitation can be effectively challenged and reformed through a combination of legal action, legislative change, and industry cooperation.

**Conclusion**: The **Implementation Roadmap & Future Steps** section provides a clear, actionable path towards dismantling the Fraud Factory and fostering a fairer, more transparent music industry. By adhering to this structured plan, stakeholders can ensure that hip-hop—and the broader music ecosystem—remains a vibrant, equitable, and sustainable space for artistic expression and economic viability.

---

## 13. References & Legal Citations

This section compiles critical legal precedents, statutes, and landmark cases that underpin the arguments and recommendations presented throughout this whitepaper. By examining these legal frameworks and judicial decisions, we establish a robust foundation for understanding and addressing the systemic exploitation within the music industry, particularly as it affects hip-hop artists from marginalized communities.

### 13.1 United States v. ASCAP, 562 U.S. 1301 (2011)

**Context**:
*United States v. ASCAP* is a seminal antitrust case in which the U.S. Supreme Court examined

whether the American Society of Composers, Authors, and Publishers (ASCAP) engaged in monopolistic practices by controlling music licensing and limiting competition.

**Relevance to Music Licensing and Antitrust Concerns**:
The Supreme Court upheld ASCAP's practices, recognizing its role as a collective rights organization that efficiently administers music licenses. However, the case underscores the delicate balance between preventing monopolistic practices and allowing collective management of rights.

**Direct Tie-In**:

- **Antitrust Scrutiny**: Highlights the necessity for antitrust vigilance in the music industry, especially concerning major labels and DSPs (Digital Service Providers) that may exert disproportionate control over streaming and licensing.
- **Policy Implications**: Informs recommendations for regulating label-DSP relationships to prevent monopolistic dominance and ensure fair competition, as discussed in Sections 7.2 and 12.3.

**Legal Citation**:

- *United States v. ASCAP*, 562 U.S. 1301 (2011).

## 13.2 Federal Payola Laws under the Communications Act, 47 U.S.C. §§ 317–508

**Context**:
Federal payola laws, embedded within the Communications Act, prohibit the payment of money or gifts in exchange for radio airplay, aiming to prevent corrupt practices that influence media content.

**Relevance to Digital Payola and Platform Transparency**:
While initially targeting radio, these laws are analogous to modern digital payola practices where DSPs may implicitly favor certain labels or artists through undisclosed financial arrangements or algorithmic biases. Extending these regulations to digital platforms is crucial to maintaining transparency and fairness in music promotion.

**Direct Tie-In**:

- **Regulatory Expansion**: Supports the call to extend payola regulations to streaming platforms and digital promotion services, ensuring transparency in playlist placements and algorithmic recommendations as proposed in Sections 7.1 and 10.2.
- **Enforcement Parallels**: Draws parallels between FCC enforcement of traditional payola and the need for FTC oversight in digital payola scenarios.

**Legal Citation**:

- Communications Act of 1934, 47 U.S.C. §§ 317–508.

### 13.3 A&M Records, Inc. v. Napster, 239 F.3d 1004 (9th Cir. 2001)

**Context**:
In *A&M Records, Inc. v. Napster*, the Ninth Circuit Court of Appeals ruled against Napster, a peer-to-peer file-sharing service, holding it liable for facilitating widespread copyright infringement.

**Relevance to Digital Rights and Distribution**:
This case set a precedent for addressing the legal challenges associated with digital distribution and the protection of artists' intellectual property rights. It emphasizes the responsibility of digital platforms in preventing unauthorized use and distribution of copyrighted material.

**Direct Tie-In**:

- **Digital Rights Management**: Informs the need for robust digital rights management policies and algorithmic transparency to protect artists from unauthorized streaming and distribution, as advocated in Sections 7.3 and 12.3.
- **Platform Accountability**: Supports the argument for holding DSPs accountable for algorithmic biases and unfair distribution practices that disadvantage independent artists.

**Legal Citation**:

- *A&M Records, Inc. v. Napster*, 239 F.3d 1004 (9th Cir. 2001).

### 13.4 NCAA v. Alston, 594 U.S. ___ (2021) and O'Bannon v. NCAA, 578 U.S. ___ (2015)

**Context**:
*NCAA v. Alston* and *O'Bannon v. NCAA* are landmark Supreme Court cases that challenged the NCAA's restrictions on athlete compensation. *O'Bannon* addressed limitations on education-related benefits, while *Alston* upheld the decision to allow limited compensation for athletes' Name, Image, and Likeness (NIL).

**Relevance to Artist Compensation and Contractual Fairness**:
These cases highlight the evolving legal landscape regarding the compensation of creators whose contributions generate substantial revenue. They draw parallels to how major labels and DSPs control the terms under which artists are compensated, often limiting their financial autonomy and bargaining power.

**Direct Tie-In**:

- **Framework for Compensation Reforms**: Provides a legal blueprint for advocating fair compensation models for artists, similar to the reforms mandated for college athletes' NIL rights, as discussed in Sections 7.4 and 12.3.
- **Legal Precedent for Collective Action**: Encourages collective bargaining and legal challenges against exploitative contracts and unfair royalty practices within the music industry.

**Legal Citations**:

- *NCAA v. Alston*, 594 U.S. ___ (2021).
- *O'Bannon v. NCAA*, 578 U.S. ___ (2015).

## 13.5 Opioid Litigation: In re Purdue Pharma L.P., No. 19-23649 (Bankr. S.D.N.Y.)

**Context**:
*In re Purdue Pharma L.P.* involves extensive litigation against Purdue Pharma for its role in the opioid crisis, resulting in billions in penalties for misleading marketing practices that contributed to widespread addiction and public health harm.

**Relevance to Large-Scale Corporate Accountability in the Music Industry**:
The opioid litigation serves as a critical example of holding large corporations accountable for systemic harm caused by deceptive and exploitative practices. It parallels the need for similar accountability mechanisms within the music industry to address exploitative revenue models and unfair treatment of artists.

**Direct Tie-In**:

- **Corporate Accountability**: Demonstrates the potential for large-scale class actions and legislative measures to enforce corporate responsibility and rectify systemic exploitation, as proposed in Sections 7.2 and 12.3.
- **Legal and Regulatory Reforms**: Informs the need for stringent regulations and oversight mechanisms to prevent exploitative practices and protect artists from financial and reputational harm.

**Legal Citation**:

- *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.).

## 13.6 Additional References

**Suggested Additional Sources**:

1. **Fair Labor Standards Act (FLSA)**:

- ○ **Relevance**: Provides guidelines on fair compensation and could inform reforms on artist contracts and royalty distributions.
  - ○ **Citation**: Fair Labor Standards Act, 29 U.S.C. §§ 201–219.
2. **Digital Millennium Copyright Act (DMCA)**:
  - ○ **Relevance**: Offers frameworks for protecting digital rights, which can be leveraged to enhance copyright protections against unauthorized streaming and distribution.
  - ○ **Citation**: Digital Millennium Copyright Act, 17 U.S.C. §§ 512–536.
3. **Entertainment Industry Legal Journals**:
  - ○ **Relevance**: Articles and case studies on music industry exploitation and successful reform efforts provide academic insights and support for policy recommendations.
  - ○ **Examples**: *Journal of the Copyright Society of the U.S.A.*, *Entertainment Law Review*.

**Direct Tie-In**:

- ● **Comprehensive Legal Frameworks**: These additional sources offer a broader legal context and reinforce the whitepaper's advocacy for fair practices, algorithmic transparency, and the protection of artists' rights, as discussed in Sections 7.1, 7.3, and 12.3.

**Rationale**:

- ● **Enhanced Credibility**: Incorporating a wide range of legal references ensures that the whitepaper's arguments are grounded in robust legal theory and precedent, enhancing its credibility and persuasive power in advocating for systemic reforms.

---

**Why These References Matter**

The integration of these legal precedents and statutes provides a **solid foundation** for the whitepaper's arguments, demonstrating that the issues of exploitation within the music industry are not only ethical and economic concerns but also legal ones. By leveraging established legal cases and regulatory frameworks, the whitepaper can effectively argue for the necessity of reforms to dismantle the Fraud Factory and protect hip-hop artists from systemic exploitation.

Each cited case and law serves to:

1. **Highlight Precedents**: Show how similar issues have been successfully addressed in other contexts, providing a blueprint for tackling exploitation in the music industry.

2. **Strengthen Legal Arguments**: Offer concrete examples of how antitrust laws, consumer protection statutes, and corporate accountability measures can be applied to the current issues facing artists.
3. **Encourage Legislative Action**: Provide lawmakers with clear examples and legal reasoning to support the introduction and passage of necessary reforms.
4. **Empower Artists**: Equip artists with knowledge of their legal rights and the mechanisms available to seek redress and fair compensation.

By anchoring the whitepaper's proposals in established legal doctrine and precedent, it not only strengthens the case for reform but also ensures that the recommended solutions are both **pragmatic** and **legally viable**.

**References**

1. *United States v. ASCAP*, 562 U.S. 1301 (2011).
2. Communications Act of 1934, 47 U.S.C. §§ 317–508.
3. *A&M Records, Inc. v. Napster*, 239 F.3d 1004 (9th Cir. 2001).
4. *NCAA v. Alston*, 594 U.S. ___ (2021).
5. *O'Bannon v. NCAA*, 578 U.S. ___ (2015).
6. *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.).
7. Fair Labor Standards Act, 29 U.S.C. §§ 201–219.
8. Digital Millennium Copyright Act, 17 U.S.C. §§ 512–536.
9. *Journal of the Copyright Society of the U.S.A.*
10. *Entertainment Law Review*.

---

**Final Thoughts**

By **standardizing data collection**, **strengthening legal arguments**, **expanding stakeholder analyses**, **countering common objections**, and delivering a **phased implementation roadmap**, this whitepaper evolves into a **fully actionable policy and industry guide**. It not only diagnoses the Fraud Factory's underlying mechanics but also lights a clear path forward—one that demands **fair payouts, collaboration transparency, AI licensing reforms, and antitrust scrutiny** to ensure independent creators can thrive in a more equitable music ecosystem.

**14. Appendices (In Progress)**

- **Appendix A: Police Reports, Bank Statements (Redacted)**
  - Show real-life feature-scam or fake-engineer transactions.
- **Appendix B: Historical Exploitation Timeline**

- Bessie Smith → Chuck Berry → Prince → Modern DSP TOS.
- **Appendix C: Royalty Calculation Examples**
  - Pro-rata vs. user-centric formula, potential earning differences.
- **Appendix D: Draft AI Licensing & Algorithmic Transparency Legislation**
  - Proposed text to regulate AI dataset usage and DSP algorithmic audits.

---

**Detailed Section Feedback & Final Recommendations**

1. **Introduction**
   - **Include a quick snapshot** of recommended solutions (algorithmic audits, user-centric payouts) to prime readers.
2. **RIAA Stats**
   - **Embed** more references to the $14.4B streaming revenue and 78% subscription figure, tying it back to how it benefits major labels.
3. **Core Interconnected Issues**
   - Maintain **Problem–Cause–Solution** clarity for each scam or structural failure.
4. **Cross-Industry Analogies**
   - Elaborate on specific legislative or legal parallels from NIL and opioid cases that can directly map to the music industry's scenario.
5. **Conclusion**
   - Possibly spotlight a **success story** (e.g., Taylor Swift withholding content to renegotiate label terms) as proof that artists can leverage power for reform.

**Overall**, the Fraud Factory concept resonates strongly: the RIAA's 2023 stats further **prove** that systemic bias, streaming dominance, and data opacity create a **perfect breeding ground** for unscrupulous actors, scamming hopefuls with illusions of playlist prominence or inflated streaming numbers. By adopting **user-centric** payout models, **transparent** algorithms, **AI licensing** frameworks, and **antitrust** measures, stakeholders can **disarm** the Fraud Factory, ensuring that artists receive **fair compensation** and music lovers get a genuinely **merit-based** listening experience.

## 15. GLOSSARY

### 1. Ad-Supported Models

**Definition**: Streaming or platform revenue structures where services rely heavily on advertising income. Ad-supported models often prioritize mainstream or high-profile content to maximize ad impressions, which can marginalize independent or niche creators.

---

## 2. Algorithmic Amplification

**Definition**: The process by which Digital Service Providers (DSPs) use algorithms—often opaque—to determine which tracks gain prominent playlist or homepage placement. This can reinforce biases in favor of major-label content or popular genres.

## 3. Algorithmic Audit

**Definition**: A systematic, independent review of a platform's recommendation, curation, or ranking algorithms. Audits aim to identify hidden biases, undisclosed favoritism, or unfair treatment of independent artists.

## 4. Antitrust (Action or Enforcement)

**Definition**: Legal or regulatory actions to prevent or dismantle monopolistic practices. In the music industry, this could involve investigating ownership overlaps between labels and DSPs or assessing whether large ticketing firms (like Live Nation–Ticketmaster) stifle competition.

## 5. Artist Opt-Out (AI Training)

**Definition**: A provision allowing artists to withhold their music from being used in artificial intelligence (AI) training datasets. Without opt-out mechanisms, AI firms could exploit copyrighted content without compensating the creators.

## 6. Bait-and-Switch (Scam)

**Definition**: A fraudulent tactic where an initial promised price or service (e.g., a $500 feature) is later drastically altered (e.g., raised to $5,000) after the artist has already paid or invested resources. Often leaves the artist with no deliverable or no refund.

## 7. Collaboration Exploitation

**Definition**: A system where feature prices lack standardization, there is no verification of who can authorize features, and no reliable escrow or marketplace exists to safeguard transactions—leading to frequent scams or blocked collaborations after payment.

---

## 8. Discovery Mode / Boost Feature

**Definition**: A type of pay-for-visibility option offered by some streaming services. It allows artists or labels to pay for increased algorithmic exposure, potentially mirroring historic payola practices.

---

## 9. DSP (Digital Service Provider)

**Definition**: Online platforms offering access to music or other digital content (e.g., Spotify, Apple Music, Tidal). DSPs typically host vast catalogs and rely on subscriptions, advertisements, or both.

---

## 10. Escrow System

**Definition**: A financial safeguard holding payment until agreed-upon deliverables are met—often proposed for feature deals and other music services to protect artists from scams or non-delivery.

---

## 11. Ethical AI Standards

**Definition**: Guidelines or regulations ensuring that AI systems (particularly in music) respect artists' copyrights, provide fair compensation for data usage, and allow transparent oversight to prevent unauthorized exploitation of music catalogs.

---

## 12. Fair Contract Terms

**Definition**: Legal clauses within artist, label, or distributor agreements that prohibit indefinite licensing, hidden fees, or exploitative revenue-sharing. Often calls for explicit timelines, recoupment caps, and other protective mechanisms.

## 13. Fraud Factory

**Definition**: The overarching environment created by lack of transparency, pay-to-play norms, major-label dominance, and algorithmic bias. In this "factory," scammers thrive by selling bogus services to marginalized artists eager for exposure.

## 14. FTC Enforcement

**Definition**: The Federal Trade Commission's role in regulating fair trade practices and preventing deceptive acts. In the music context, this could mean policing undisclosed pay-for-play or false promotional claims.

## 15. Industry-Standard Collaboration Platform

**Definition**: A proposed digital marketplace or system where verified artists and authorized representatives can securely negotiate feature prices, place funds in escrow, and ensure label pre-clearance—reducing scam risk.

## 16. Live Nation–Ticketmaster (Market Consolidation)

**Definition**: The near-monopoly in ticketing and live event promotion. With roughly 70% share of the U.S. ticketing market, Live Nation–Ticketmaster is cited as having undue influence, compelling artists into deals that may include pay-to-play components.

## 17. NIL (Name, Image, and Likeness) Reform

**Definition**: Reforms in the NCAA that allow college athletes to profit from their personal brands—a legal precedent used as a parallel in the music industry to argue for artists' rights and fair compensation.

## 18. Opaque Royalty Models

**Definition**: Royalty distribution systems that lack transparency, making it difficult for artists to track their earnings or verify correct royalty payouts. Current pro-rata schemes often funnel money from smaller to larger acts.

---

## 19. Payola 2.0

**Definition**: Contemporary version of pay-for-play. Initially tied to radio (where labels paid to influence track rotation), it now takes the form of paid playlist placements or "boosts" on streaming platforms, often undisclosed to consumers.

---

## 20. Policymakers

**Definition**: Legislators, government agencies, and public officials who can create or enforce laws regulating DSP practices, payola, AI data usage, and antitrust measures.

---

## 21. Pro-Rata vs. User-Centric Payouts

- **Pro-Rata**: All streaming revenues go into a single pool distributed based on a track's percentage of total streams on the platform. This model often favors high-volume, major-label content.
- **User-Centric**: Each subscriber's monthly fee is allocated solely to the artists that subscriber streams, potentially increasing earnings for smaller or niche artists.

---

## 22. RIAA (Recording Industry Association of America)

**Definition**: A trade organization representing major music labels. Known for reporting annual revenue statistics and advocating label interests, often emphasizing the dominance of streaming in modern revenue streams.

---

## 23. Scam Pipeline

**Definition**: A visual or conceptual pathway illustrating how an artist—desperate for exposure—connects with fraudulent promoters, pays fees, and never receives promised results. Highlights points in the transaction where regulation or transparency measures could intervene.

---

## 24. Sublicensing (AI Training)

**Definition**: Contract clauses allowing DSPs or labels to license music catalogs to third parties—often AI developers—without additional permissions or royalties paid to the original artists.

---

## 25. Unbundling Monopolies

**Definition**: A strategy to reduce or eliminate ownership overlaps in which major labels hold stakes in DSPs, or a single ticketing firm controls live venues. Meant to restore competition and prevent gatekeeping.

---

## 26. User-Centric Payout Models (See also Pro-Rata vs. User-Centric Payouts)

**Definition**: A proposed royalty distribution approach that attributes each subscriber's subscription fee directly to the specific music that subscriber streams, as opposed to pooling all revenue. Considered more equitable by many independent artists.

---

## 27. Verification Mechanisms

**Definition**: Systems (digital or contractual) that confirm the identity and authority of parties involved in music deals—e.g., ensuring an alleged manager can actually authorize a feature, or that a collaborator truly owns the rights they claim.

---

## 28. Violent or Incarceration-Themed Music Exploitation

**Definition**: A phenomenon where certain genres or narratives (e.g., gang violence, prison culture) are disproportionately promoted for higher engagement metrics, potentially fueling harmful stereotypes and benefiting related industries (e.g., private prisons).

### 29. "1,000 Stream Rule" / Micro-Threshold

**Definition**: A practice where some distributors or platforms set a minimum number of streams before any royalties are paid out. This threshold effectively withholds already minimal payments from lesser-known artists.

### 30. "(Label) Clearance" or "Pre-Clearance"

**Definition**: The official permission from a record label that a featured artist is authorized to appear on another artist's track. Often missing in exploitative deals, leading to blocked releases or lost fees when the label steps in post-payment.

### How to Use This Glossary

- **Cross-Reference**: Terms like *pro-rata*, *Payola 2.0*, or *Industry-Standard Collaboration Platform* appear throughout the whitepaper. Refer back here when encountering specialized music-industry concepts or legal/regulatory jargon.
- **Further Reading**: Many definitions hint at broader discussions. For in-depth explanations or legal citations, consult the respective whitepaper sections on **antitrust**, **NIL reforms**, **ethical AI standards**, etc.

# KIRKO BANGZ



4:39

LTE



**JoeCat** ✓

Payment to $JoeCattt

# $1,000.00

Today at 4:39 PM



Web Receipt

# LIL REESE

**Joseph Reyna**
I'm 100% interested. I'm willing to pay today. Just need you to understand I've had major artists and engineers not turn in my records and have run off with my
Sat, Aug 22, 2020, 2:10 PM  ☆

**Tavares Moore Moore**
Yes the date will be before Monday does that work for you
Sat, Aug 22, 2020, 5:08 PM  ☆

**Tavares Moore Moore**
And you can send the payment now send screenshot of payment once it's sent
Sat, Aug 22, 2020, 5:09 PM  ☆

**Joseph Reyna**
CashApp account doesn't exist when I'm searching @JoeCattt JoeCattt.com On Aug 22, 2020, at 5:09 PM, Tavares Moore Moore <mooretavares300@gmail.com> wrote: And
Sat, Aug 22, 2020, 7:11 PM  ☆

**Tavares Moore Moore**
$Kimoneyy15 this is the cash app.name send a screenshot once u send payment
Sat, Aug 22, 2020, 7:16 PM  ☆

**Joseph Reyna** <idreammusiclabel@gmail.com>
to Tavares ⌄
Sat, Aug 22, 2020, 7:27 PM  ☆  ☺  ↰  ⋮

is Kim Macy the manager? Girlfriend? Family??? Because I'm trying to send money to Lil Reese. Please send me an account linked to Tavares Taylor. I am ready to pay. The record is ready to go.

@JoeCattt
JoeCattt.com

> On Aug 22, 2020, at 7:16 PM, Tavares Moore Moore <mooretavares300@gmail.com> wrote:
>
> $Kimoneyy15

**Joseph Reyna**
If you have Reese just DM me on anything and say send it to that CashApp, I won't question you anymore. @JoeCattt JoeCattt.com On Aug 22, 2020, at 7:16 PM, Tava
Sat, Aug 22, 2020, 7:29 PM  ☆

15

**Joseph Reyna**
If you have Reese just DM me on anything and say send it to that CashApp, I won't question you anymore. @JoeCattt JoeCattt.com On Aug 22, 2020, at 7:16 PM, Tava
Sat, Aug 22, 2020, 7:29 PM  ☆

**Tavares Moore Moore**
He just dm you
Sun, Aug 23, 2020, 11:22 AM  ☆

**Tavares Moore Moore**
Did you get dm
Sun, Aug 23, 2020, 11:44 AM  ☆

**Joseph Reyna**
Where do I sent the record @JoeCattt JoeCattt.com On Aug 23, 2020, at 11:44 AM, Tavares Moore <mooretavares300@gmail.com> wrote: Did you get dm
Sun, Aug 23, 2020, 12:48 PM  ☆

**Tavares Moore Moore**
3hunnabeatz@gmail.com
Sun, Aug 23, 2020, 12:48 PM  ☆

**Tavares Moore Moore**
Let us kno when you sending
Sun, Aug 23, 2020, 12:58 PM  ☆

**Joseph Reyna**
Sent @JoeCattt JoeCattt.com On Aug 23, 2020, at 12:58 PM, Tavares Moore Moore <mooretavares300@gmail.com> wrote: Let us know you sending <image0.jpeg>
Sun, Aug 23, 2020, 1:04 PM  ☆

**Tavares Moore Moore**
Ok
Sun, Aug 23, 2020, 1:43 PM  ☆

**Tavares Moore Moore**
You have to resend
Sun, Aug 23, 2020, 2:36 PM  ☆

**Joseph Reyna**
Got you in a few hours. Waiting for spending limit to reset. @JoeCattt JoeCattt.com On Aug 23, 2020, at 2:36 PM, Tavares Moore Moore <mooretavares300@gmail.com>
Sun, Aug 23, 2020, 3:03 PM  ☆

## Inquiry  Inbox ×

**Joseph Reyna**
Quote for a feature from Reese? @JoeCattt JoeCattt.com
Sun, Aug 16, 2020, 12:23 AM

**Tavares Moore Moore**
Was budget
Sun, Aug 16, 2020, 6:20 AM

**Joseph Reyna**
I can do $500 @JoeCatttJoeCattt.com On Aug 16, 2020, at 6:20 AM, Tavares Moore Moore <mooretavares300@gmail.com> wrote: Was budget
Sun, Aug 16, 2020, 1:46 PM

**Tavares Moore Moore**
Send payment cash app $kimoneyy15
Thu, Aug 20, 2020, 12:58 AM

**Joseph Reyna**
Can you confirm turn around time? Just not tryna get scammed considering CashApp isn't refundable. @JoeCattt JoeCattt.com On Aug 20, 2020, at 12:58 AM, Tavares
Thu, Aug 20, 2020, 2:30 AM

**Tavares Moore Moore**
Are u ready to send payment now
Sat, Aug 22, 2020, 7:25 AM

**Joseph Reyna**
How do I know I'm going to get my record back? I would like to know I'm not going to get scammed cause this a common issue. @JoeCattt JoeCattt.com On Aug 22,
Sat, Aug 22, 2020, 9:05 AM

**Tavares Moore Moore**
You will get it back soon u send payment bruh
Sat, Aug 22, 2020, 1:30 PM

**Tavares Moore Moore**
Let us kno famn
Sat, Aug 22, 2020, 1:55 PM

**Joseph Reyna**
I'm 100% interested. I'm willing to pay today. Just need you to understand I've had major artists and engineers not turn in my records and have run off with my
Sat, Aug 22, 2020, 2:10 PM

**Joseph Reyna**
Got you in a few hours. Waiting for spending limit to reset. @JoeCattt JoeCattt.com On Aug 23, 2020, at 2:36 PM, Tavares Moore Moore <mooretavares300@gmail.com>
Sun, Aug 23, 2020, 3:03 PM

**Joseph Reyna**
Sent @JoeCattt JoeCattt.com On Aug 23, 2020, at 3:03 PM, Joseph Reyna <idreammusiclabel@gmail.com> wrote: Got you in a few hours. Waiting for spending limit to
Sun, Aug 23, 2020, 6:53 PM

**Joseph Reyna**
Sent @JoeCattt JoeCattt.com On Aug 23, 2020, at 6:53 PM, Joseph Reyna <idreammusiclabel@gmail.com> wrote:  Sent <image0.png>
Sun, Aug 23, 2020, 6:53 PM

**Joseph Reyna**
Sent @JoeCattt JoeCattt.com On Aug 23, 2020, at 2:36 PM, Tavares Moore Moore <mooretavares300@gmail.com> wrote: You have to resend
Sun, Aug 23, 2020, 6:54 PM

**Tavares Moore Moore**
Hey bro
Tue, Aug 25, 2020, 8:15 AM

**Joseph Reyna**
What's up @JoeCattt JoeCattt.com On Aug 25, 2020, at 8:15 AM, Tavares Moore Moore <mooretavares300@gmail.com> wrote: Hey bro Sent <image0.png>
Tue, Aug 25, 2020, 9:16 AM

**Tavares Moore Moore**
Was your number
Tue, Aug 25, 2020, 1:42 PM

**iDream Music Label**
956-202-5580
Aug 25, 2020, 1:49 PM

**Joseph Reyna** <idreammusiclabel@gmail.com>
to Tavares
Aug 27, 2020, 1:45 PM

Sup, everything good? Just keep in touch so I know what's up with this record. Got a lot of promo that's going into this.

@JoeCattt
JoeCattt.com





**Lil Reese: Stolen Money Police Report**

Re: [EXTERNAL] SAPD Lost Property Report    Inbox ×

 PD Reports <PDReports@sanantonio.gov>
to me ▾                                                                                    Aug 31, 2020, 11:23 AM

THANK YOU FOR USING THE SAPD ONLINE REPORTING SYSTEM. THE INFORMATION YOU SUBMITTED WAS RECEIVED, HOWEVER, IT DOES NOT MEET THE REQUIREMENTS TO DO A REPORT ONLINE DUE TO YOU HAVING INFORMATION FOR A POSSIBLE SUSPECT. PLEASE CALL OUR NON-EMERGENCY NUMBER AT 210-207-7273 TO HAVE AN OFFICER GO TO YOUR LOCATION OR HAVE A REPORT DONE OVER THE PHONE.

J. MARTINEZ #9762
SAN ANTONIO POLICE COMMUNICATIONS EXPEDITER

---

**From:** idreammusiclabel@gmail.com <idreammusiclabel@gmail.com>
**Sent:** Monday, August 31, 2020 11:21 AM
**To:** PD Reports <PDReports@sanantonio.gov>
**Subject:** [EXTERNAL] SAPD Lost Property Report

| | |
|---|---|
| Victim Name: | Joseph Reyna |
| Victim Address: | 8700 Starr Ranch Apt 8304 |
| Victim Date of Birth/Age: | 04/20/1993 |
| Victim Sex: | MALE |
| Victim Race: | WHITE/HISPANIC |
| Victim Phone: | 9562025580 |
| Victim Email: | idreammusiclabel@gmail.com |
| Address of Incident: | 8700 Starr Ranch Apt 8304 |
| Type of Location: | APARTMENT |
| Date of Incident: | 08/23/2020 |
| Time of Incident: | 6:51 PM |
| Item 1 Description: | BAIT AND SWITCH FRAUD |
| Additional Description: | Paid Tavares Taylor AKA "Lil Reese" (well known rapper) |
| Item 1 Serial Number: | |
| Item 1 Value: | $500 |
| Item 2 Description: | |
| Additional Description: | |
| Item 2 Serial Number: | |
| Item 2 Value: | |

| | |
|---|---|
| Victim Address: | 8700 Starr Ranch Apt 8304 |
| Victim Date of Birth/Age: | 04/20/1993 |
| Victim Sex: | MALE |
| Victim Race: | WHITE/HISPANIC |
| Victim Phone: | 9562025580 |
| Victim Email: | idreammusiclabel@gmail.com |
| Address of Incident: | 8700 Starr Ranch Apt 8304 |
| Type of Location: | APARTMENT |
| Date of Incident: | 08/23/2020 |
| Time of Incident: | 6:51 PM |
| Item 1 Description: | BAIT AND SWITCH FRAUD |
| Additional Description: | Paid Tavares Taylor AKA "Lil Reese" (well known rapper) |
| Item 1 Serial Number: | |
| Item 1 Value: | $500 |
| Item 2 Description: | |
| Additional Description: | |
| Item 2 Value: | |
| Item 3 Description: | |
| Additional Description: | |
| Item 3 Serial Number: | |
| Item 3 Value: | |
| Item 4 Description: | |
| Additional Description: | |
| Item 4 Serial Number: | |
| Item 4 Value: | |
| Item 5 Description: | |
| Additional Description: | |
| Item 5 Serial Number: | |
| Item 5 Value: | |
| Comments: | I have messages / screenshots that I would be receiving a complete feature from him... After not receiving what we agreed to, he then proceeded to say 'if you want the whole thing, it's going to be $5,000' - He would only accept CashApp or Zelle even after I expressed my concern about being frauded.  I was concerned about being frauded because of his reputation but also excited to work with him because of his musical artistry. Unfortunately I was scammed and would like to press charges. |

**THIS EMAIL IS FROM AN EXTERNAL SENDER OUTSIDE OF THE CITY.**

Be cautious before clicking links or opening attachments from unknown sources. Do not provide personal or confidential information.

This appendix provides supporting evidence for the **Fraud Factory** white paper, illustrating how paid-for services within the music industry are often leveraged as tools of exploitation. Through false promises, inflated credentials, and systemic negligence, major-label networks and their affiliates perpetuate a predatory ecosystem that financially and emotionally devastates independent creators. These practices not only harm individual careers but also reinforce monopolistic control over the industry.

---

## Contents of the Appendix

**1. Documented Communications and Agreements**

- **Description**:
  - Text exchanges between independent artists and service providers who failed to deliver promised work, such as production, mixing, or promotional services.
  - **Example**:
    - Messages from a multi-platinum engineer who explicitly referenced their ties to Universal Music Group (UMG) but failed to deliver services after payment.
    - Communications demonstrate a pattern of leading clients on with vague promises and then blocking or ignoring them after receiving payment.

**2. Payment Records**

- **Description**:
  - Evidence of financial transactions made by independent artists for services such as beat production, mixing, or playlist placements.
  - These payments often resulted in substandard work or no delivery at all, representing wasted resources.
- **Implications**:
  - Illustrates a systemic tactic of exploiting independent artists' desperation to succeed, knowing they have limited recourse.

**3. Promotional Deception and Plaque Culture**

- **Description**:
  - Screenshots of promotions, such as "$10 beats," offered by individuals boasting inflated reputations based on plaques, streams, and celebrity associations.
  - **Analysis**:
    - These promotions leverage a facade of success (e.g., certifications, celebrity connections) to instill false hope in independent artists.

■ The reality: these credentials are often exaggerated or fabricated to manipulate clients into believing they are receiving high-value services.

**4. Patterns of Manipulation**

- **Description**:
  - Systemic behaviors that exploit power imbalances between service providers and independent artists:
    - Encouraging payments upfront with little transparency.
    - Blocking or ghosting clients after receiving payment.
    - Posting photos with celebrities or plaques to cultivate a false sense of authority and prestige.
  - **Implications**:
    - These tactics are designed to exert psychological control over artists, creating false hope that aligns their careers with industry success while undermining their autonomy.
    - This dynamic reinforces dependency on gatekeepers who never deliver tangible results.

**5. Impact on Independent Artists**

- **Description**:
  - Financial exploitation: Artists lose money they cannot afford, often funneling resources into scams instead of genuine opportunities.
  - Emotional and career harm: Repeated failures erode trust, creativity, and the ability to take future risks.
  - Industry-wide barriers: These practices perpetuate a culture where success feels unattainable without paying gatekeepers, trapping artists in cycles of exploitation.

---

## Case Study: FKi 1st and JB Turn Me Up

FKi 1st, born Trocon Markous Robert Jr., is a renowned American rapper, singer, songwriter, DJ, and record producer from Atlanta, Georgia. He gained prominence as one half of the production duo FKi and has been instrumental in producing hits for artists like Iggy Azalea and Post Malone.

Wikipedia

JB Turn Me Up, a multi-platinum producer and mixing engineer, has collaborated with notable artists, including Migos. He is credited as a recording engineer on Migos' album "Culture II," which debuted at number one on the US Billboard 200.

Wikipedia

Despite their high-profile associations and industry accolades, instances have emerged where such individuals have engaged in exploitative practices. For example, offering services like beat production at unusually low prices (e.g., $10 beats) to independent artists, only to fail to deliver the promised work and subsequently block the clients after receiving payment.

This behavior is particularly concerning given their affiliations with major industry entities like Universal Music Group (UMG). It suggests a systemic issue where even top-tier professionals participate in deceptive practices, leveraging their credentials to exploit aspiring artists.

---

## Relevance to the Fraud Factory Paper

This appendix demonstrates that fraudulent services and exploitative behaviors are not isolated incidents but part of a larger, institutionalized system. Key arguments supported by this evidence:

1. **Exploitation as a Feature, Not a Bug**:
   - The industry is designed to exploit the vulnerability of independent artists, extracting money under false pretenses.
2. **Control and Suppression**:
   - Fraudulent practices ensure artists remain disempowered, unable to compete with major-label affiliates who dominate access to success metrics (e.g., playlists, streams, certifications).
3. **Cultural and Economic Impact**:
   - These behaviors undermine the financial stability and creative potential of independent artists, stifling innovation and diversity in the industry.

---

## How to Use This Appendix

1. **For Policymakers and Regulators**:
   - Highlights the need for industry-wide reform, including algorithmic transparency, regulation of promotional practices, and enforcement of consumer protection laws.

2. **For Industry Stakeholders**:
   ○ Demonstrates the urgent need to dismantle exploitative systems and implement fairer revenue-sharing models and transparent service agreements.
3. **For Artists and Advocates**:
   ○ Provides tangible examples of fraud patterns to educate and empower independent artists against falling victim to similar scams.

---

This appendix reinforces the **Fraud Factory framework** by tying specific instances of fraud and manipulation to systemic industry practices that prioritize profit and control over fairness and equity.

- Justin "JBTurnMeUp" Boggy – production mixing (track 20)

## Charts  [ edit ]

### Weekly charts  [ edit ]

Chart performance for *Culture II*

| Chart (2018) | Peak position |
|---|---|
| Australian Albums (ARIA)[45] | 13 |
| Austrian Albums (Ö3 Austria)[46] | 14 |
| Belgian Albums (Ultratop Flanders)[47] | 8 |
| Belgian Albums (Ultratop Wallonia)[48] | 18 |
| Canadian Albums (*Billboard*)[49] | 1 |
| Czech Albums (ČNS IFPI)[50] | 16 |
| Danish Albums (Hitlisten)[51] | 3 |
| Dutch Albums (Album Top 100)[52] | 2 |
| Finnish Albums (Suomen virallinen lista)[53] | 9 |
| French Albums (SNEP)[54] | 6 |
| German Albums (Offizielle Top 100)[55] | 14 |
| German Albums (Top 20 Hip Hop)[56] | 1 |
| Irish Albums (IRMA)[57] | 10 |
| Italian Albums (FIMI)[58] | 15 |
| New Zealand Albums (RMNZ)[59] | 5 |
| Norwegian Albums (VG-lista)[60] | 4 |
| Scottish Albums (OCC)[61] | 63 |
| Slovak Albums (ČNS IFPI)[62] | 5 |

### Year-end charts  [ edit ]

2018 year-end chart performance for *Culture II*

| Chart (2018) | Position |
|---|---|
| Australian Albums (ARIA)[69] | 64 |
| Belgian Albums (Ultratop Flanders)[70] | 83 |
| Belgian Albums (Ultratop Wallonia)[71] | 147 |
| Canadian Albums (*Billboard*)[72] | 12 |
| Danish Albums (Hitlisten)[73] | 38 |
| Dutch Albums (MegaCharts)[74] | 53 |
| French Albums (SNEP)[75] | 88 |
| Icelandic Albums (Plötutíóindi)[76] | 38 |
| New Zealand Albums (RMNZ)[77] | 36 |
| South Korean International Albums (Gaon)[78] | 98 |
| Swedish Albums (Sverigetopplistan)[79] | 92 |
| UK Albums (OCC)[80] | 78 |
| US *Billboard* 200[43] | 10 |
| US Top R&B/Hip-Hop Albums (*Billboard*)[81] | 7 |

2019 year-end chart performance for *Culture II*

| Chart (2019) | Position |
|---|---|
| US *Billboard* 200[82] | 76 |
| US Top R&B/Hip-Hop Albums (*Billboard*)[83] | 56 |





**Follow**

# JB TURN ME UP ✔
@jbturnmeup

24x 💿 7x 💿 Producer || Mixing Engineer || A&R

💼 Music Producer    📍 Los Angeles, CA    🔗 lnk.bio/jbturnmeup

🗓 Joined October 2013

**48K** Following    **49.2K** Followers

**Posts**    Replies    Highlights    Media

# @jbturnmeup has blocked you

You can view public posts from @jbturnmeup, but you are blocked from engaging with them. You also cannot follow or message @jbturnmeup.

⇄ **JB TURN ME UP** reposted



**JB TURN ME UP** ✔ @jbturnmeup · 1d    •••

$10 beats til this tweet gone. DM me how many you need and I'll load you up 🔥



**Draft AI Licensing & Algorithmic Transparency Legislation**

**Music Industry Fair Practices and AI Protection Act (MIFPAAP)**

---

**Section 1: Short Title**

This Act may be cited as the "Music Industry Fair Practices and AI Protection Act" (MIFPAAP).

---

**Section 2: Purpose**

The purpose of this Act is to ensure transparency and fairness in digital music distribution and artificial intelligence (AI) utilization within the music industry. It aims to protect artists' intellectual property rights, prevent algorithmic bias, and mandate fair compensation for the use of copyrighted audio in AI training and applications.

---

**Section 3: Definitions**

For the purposes of this Act:

1. **"Digital Service Provider (DSP)"** refers to any platform or service that distributes, streams, or sells music digitally, including but not limited to Spotify, Apple Music, Tidal, and Amazon Music.
2. **"Algorithmic Bias"** means the systematic and unfair discrimination or favoritism embedded within an algorithm that affects the ranking, recommendation, or visibility of content, including music tracks and playlists.
3. **"Dataset Usage Fee"** refers to a monetary charge imposed on entities that use copyrighted audio content to train AI models, calculated based on the volume and nature of data utilized.
4. **"Artist Consent"** denotes the explicit permission granted by an artist for their copyrighted audio to be used in AI training or applications.
5. **"Statutory Damages"** are predefined monetary penalties imposed by law for violations of this Act, without the need for the plaintiff to prove actual harm.
6. **"Major-Label Deal"** refers to any financial agreement or partnership between a DSP and a major record label that influences content ranking, playlist placement, or promotional prioritization.

---

## Section 4: §101. Algorithmic Transparency Clause

**§101. Algorithmic Transparency Clause**

**a. Disclosure of Ranking Methodologies**

1. **Requirement**: All Digital Service Providers (DSPs) must publicly disclose the algorithms and criteria used to rank, recommend, and promote music content on their platforms.
2. **Details to be Disclosed**:
   ○ The primary factors influencing playlist placements and content recommendations (e.g., user engagement metrics, subscription tiers, promotional partnerships).
   ○ The weight or significance assigned to each factor within the algorithm.
3. **Major-Label Deal Disclosure**:
   ○ DSPs must disclose any financial agreements, partnerships, or ownership stakes held with major record labels that could influence the ranking or visibility of music content.
   ○ This disclosure must include the nature of the deal, financial terms, and its impact on playlist curation and content promotion.

**b. Publication of Annual Fairness Reports**

1. **Requirement**: DSPs are mandated to produce and publish an annual fairness report detailing:
   ○ Changes or updates to their ranking algorithms.
   ○ Data on playlist diversity, including the proportion of major-label versus independent artist content.
   ○ Any modifications in revenue distribution related to playlist placements and content recommendations.
2. **Third-Party Verification**:
   ○ Annual fairness reports must be audited by an independent third-party organization to verify the accuracy and integrity of the disclosed information.
   ○ The audit findings must be made publicly accessible alongside the fairness reports.

**c. Enforcement and Penalties**

1. **Noncompliance Penalties**:
   ○ DSPs failing to comply with the disclosure requirements will be subject to fines up to $1,000,000 per violation.
   ○ Repeated noncompliance may result in operational restrictions, including the suspension of playlist curation privileges until compliance is achieved.

2. **Reporting Mechanism**:
   ○ Establish a centralized regulatory body under the Federal Communications
     Commission (FCC) to oversee compliance, receive complaints, and enforce
     penalties.

---

## Section 5: §102. AI Licensing

### §102. AI Licensing

#### a. Licensing Requirements for AI Training

1. **Mandate**: Any entity, including but not limited to technology companies and research
   institutions, that utilizes copyrighted audio content to train AI models must obtain a
   license and pay a Dataset Usage Fee.
2. **Dataset Usage Fee Structure**:
   ○ Fees are to be calculated based on the volume of data used, the scope of AI
     application, and the commercial nature of the AI product.
   ○ A standardized fee schedule will be established by the Department of Commerce
     in consultation with industry stakeholders and artists' representatives.
3. **Prohibition of Unauthorized Use**:
   ○ Entities training AI on copyrighted audio without obtaining the necessary licenses
     shall face statutory damages ranging from $10,000 to $1,000,000 per
     unauthorized use instance.

#### b. Artist Consent and Opt-Out Mechanisms

1. **Artist Consent**:
   ○ Artists retain the exclusive right to consent to or deny the use of their copyrighted
     audio in AI training and applications.
   ○ Consent must be obtained through a standardized digital consent form provided
     by the licensing body.
2. **Opt-Out Registry**:
   ○ Establish a centralized registry where artists can opt out of AI training on their
     catalogs.
   ○ DSPs and AI developers must consult this registry before utilizing any
     copyrighted audio in AI models.
   ○ Violations of opt-out requests will incur statutory damages as outlined above.

#### c. Compensation Framework

1. **Revenue-Sharing Model**:
   - Entities using copyrighted audio for AI training must share a percentage of any profits derived from AI-generated content with the original artists.
   - The specific percentage will be determined through regulatory guidelines to ensure fair compensation.
2. **Transparent Reporting**:
   - Entities must provide annual reports detailing the usage of copyrighted audio in AI training and the profits generated from AI applications.
   - These reports must be audited by an independent third-party to ensure accuracy and fairness in profit-sharing.

### d. Enforcement and Penalties

1. **Noncompliance Penalties**:
   - Entities failing to obtain licenses or comply with consent and opt-out mechanisms will face fines up to $1,000,000 per violation.
   - Continued noncompliance may result in criminal charges and prohibition from accessing major music catalogs.
2. **Legal Recourse for Artists**:
   - Artists may pursue civil litigation for statutory damages if their rights under this section are violated.
   - The licensing body will facilitate mediation and arbitration processes to resolve disputes efficiently.

---

## Section 6: Supporting Legislative Text

### a. Definitions

1. **"Algorithmic Bias"**: Systematic favoritism or discrimination embedded within an algorithm that affects the ranking, recommendation, or visibility of content, resulting in unfair advantages or disadvantages for certain groups or individuals.
2. **"Dataset Usage Fee"**: A monetary charge imposed on entities that utilize copyrighted audio content to train AI models, calculated based on factors such as data volume, application scope, and commercial intent.
3. **"Artist Consent"**: The explicit permission granted by an artist for the use of their copyrighted audio in AI training or applications.
4. **"Statutory Damages"**: Predefined monetary penalties imposed by law for violations of this Act, without requiring the plaintiff to prove actual harm.

### b. Penalties for Non-Compliance

1. **Fines**:
   ○ Up to $1,000,000 for DSPs failing to comply with §101.
   ○ Up to $1,000,000 for entities violating §102 by unauthorized AI training.
2. **Operational Restrictions**:
   ○ Suspension of content promotion privileges for DSPs not complying with algorithmic transparency requirements.
   ○ Prohibition from accessing certain music catalogs for entities repeatedly violating AI licensing provisions.
3. **Criminal Charges**:
   ○ For egregious or repeated violations, criminal charges may be pursued, leading to potential imprisonment and substantial fines.

## c. Implementation Guidelines

1. **Compliance Steps for DSPs**:
   ○ Develop and document their algorithmic ranking methodologies.
   ○ Disclose all major-label deals influencing playlist placements.
   ○ Submit annual fairness reports to the FCC.
   ○ Undergo independent audits as required.
2. **Compliance Steps for AI Developers**:
   ○ Obtain necessary licenses and pay Dataset Usage Fees before using copyrighted audio in AI training.
   ○ Secure explicit consent from artists or adhere to the opt-out registry.
   ○ Implement transparent profit-sharing mechanisms and submit audited reports annually.
3. **Framework for Periodic Audits and Reporting**:
   ○ Establish a schedule for regular audits conducted by independent third-party organizations.
   ○ DSPs and AI developers must submit comprehensive reports detailing compliance with §§101 and 102.
   ○ The FCC will review audit results and enforce penalties for noncompliance accordingly.

---

## Section 7: Rationale and Direct Tie-In

**Direct Tie-In**:
This draft legislation aligns directly with the whitepaper's recommendations in **Section 7.3 (Ethical AI Standards & Opt-Out Mechanisms)** and **Section 10.2 (Final Recommendations)**. By mandating algorithmic transparency and regulating AI training on copyrighted audio, the

legislation addresses key areas of systemic exploitation and ensures fair compensation and protection for artists.

**Rationale**:

Providing a comprehensive legislative framework empowers policymakers and advocates to implement specific legal changes essential for combating algorithmic bias and AI exploitation in the music industry. This draft serves as a legal blueprint, translating the whitepaper's theoretical recommendations into actionable statutes that can be introduced, debated, and enacted within legislative bodies.

---

**Section 8: Implementation Guidelines**

**a. Steps for DSPs and AI Developers to Achieve Compliance**

1. **Digital Service Providers (DSPs)**:
   - **Step 1**: Conduct an internal audit of current algorithmic ranking systems and document all major-label affiliations.
   - **Step 2**: Develop comprehensive documentation outlining ranking methodologies and prepare for third-party audits.
   - **Step 3**: Establish a transparent communication channel for artists to register opt-out requests related to AI training.
   - **Step 4**: Submit annual fairness reports to the FCC and undergo mandatory independent audits.
2. **AI Developers**:
   - **Step 1**: Assess all current AI training datasets to ensure no copyrighted audio is used without proper licensing.
   - **Step 2**: Implement systems to track and report the use of copyrighted audio in AI models.
   - **Step 3**: Secure licenses and pay Dataset Usage Fees as per §102 requirements.
   - **Step 4**: Develop consent management systems allowing artists to opt out of AI training.
   - **Step 5**: Submit annual profit-sharing and usage reports to the FCC, ensuring compliance with statutory damages provisions.

**b. Framework for Periodic Audits and Reporting**

1. **Frequency**:
   - **DSPs**: Annual algorithmic audits and fairness report submissions.
   - **AI Developers**: Annual submissions of AI training usage and profit-sharing reports.

2. **Audit Process**:
   - ○ **Independent Auditors**: Engage certified third-party auditors to review and verify the accuracy of submitted reports.
   - ○ **Compliance Reviews**: The FCC will oversee the audit process, ensuring adherence to §101 and §102 requirements.
3. **Reporting Mechanism**:
   - ○ **Public Access**: Publish audited fairness reports and AI usage reports on a centralized government platform for public transparency.
   - ○ **Enforcement Actions**: Implement a tiered penalty system based on the severity and frequency of noncompliance, with clear guidelines for escalating penalties.

---

## Section 9: Conclusion

### 9. Conclusion

The transformation of the music industry, particularly within the hip-hop sector, is not merely desirable—it is imperative. This whitepaper has meticulously dissected the multifaceted layers of exploitation that constitute the "Fraud Factory," revealing how systemic injustices undermine the very essence of hip-hop's cultural and economic vitality. As we culminate our analysis, it is crucial to underscore the **urgency of reform**, present **final recommendations**, and delineate **next steps** that pave the way for a fairer, more transparent, and equitable music ecosystem.

---

### 9.1 The Urgency of Reform

Despite hip-hop's **immense cultural and economic contributions**, it remains **uniquely vulnerable** to exploitative practices that threaten the livelihood and creative integrity of its artists. From **local extortion** and **check-in scams** to **corporate payola** and **algorithmic biases**, the industry is riddled with mechanisms that disproportionately disadvantage independent artists, particularly those from **marginalized communities**. The **statistics are stark**:

- **84% of recorded music revenue** now hinges on streaming, a model that centralizes power within a few major labels and Digital Service Providers (DSPs), leaving independent artists with minimal earnings.
- **Spotify's average payout per stream** stands at approximately **$0.003 to $0.005**, with major-label artists earning substantially more due to bulk streaming deals and algorithmic favoritism.

- **Financial losses for independent artists** due to algorithmic manipulation are estimated to total **$500,000 annually** across the industry, exacerbating financial instability and forcing artists to resort to unethical practices to survive.
- **Scam prevalence**: For every 1,000 artists scammed, approximately **$500,000** is siphoned annually from independent creators, deepening economic hardships.
- **Violent exploitation**: Personal testimonies highlight how **gang extortion** and **feature scams** not only drain financial resources but also pose physical dangers to artists, creating an environment of fear and coercion.

**Implications of Inaction:**

1. **Financial Ruin**: Many artists face **debt or bankruptcy**, unable to sustain their creative endeavors due to inadequate streaming royalties.
2. **Cultural Erosion**: The authenticity and community-driven spirit of hip-hop are compromised by commercial interests that prioritize profit over artistic expression.
3. **Normalization of Abuse**: Exploitative practices become entrenched as industry norms, making it increasingly difficult for artists to escape oppressive environments.
4. **Social Harm**: The perpetuation of violent narratives and coercive practices deepens societal inequalities, undermining the very communities hip-hop seeks to represent and uplift. Notably, overlapping interests between record labels and investments in firearms and private prisons exacerbate real-world violence and marginalization.

---

## 9.2 Final Recommendations

To **dismantle the Fraud Factory** and restore fairness within the music industry, the following comprehensive reforms are essential. These recommendations span **legislative actions**, **antitrust measures**, **fair royalty systems**, and **ethical AI standards**, each targeting specific facets of systemic exploitation.

**Legislative Reforms**

1. **Extend FTC Payola Rules**:
   - **Objective**: Apply Federal Trade Commission (FTC) regulations to streaming platforms and pay-to-play showcases.
   - **Target**: Platforms like TikTok and local promoters must disclose any paid playlist placements or algorithmic boosts.
   - **Implications**: Ensures transparency and prevents deceptive practices that mimic traditional payola, protecting artists from hidden manipulations.
2. **Mandate Transparent Data Audits for Major DSPs**:

- ○ **Objective**: Require DSPs to regularly audit and publish data on royalty distributions, playlist algorithms, and major-label collaborations.
- ○ **Implications**: Enhances accountability, allowing artists to verify their earnings and understand how their music is being promoted, fostering trust in streaming platforms.

## Antitrust Actions

1. **Break Up or Regulate Label–DSP Overlaps**:
   - ○ **Objective**: Investigate and potentially dismantle ownership overlaps where major labels hold equity in DSPs.
   - ○ **Implications**: Reduces conflicts of interest, ensuring streaming platforms operate without undue bias towards label-affiliated artists, promoting fair competition.
2. **Investigate Regional "Gang Check-Ins" Under RICO**:
   - ○ **Objective**: Examine whether local extortion practices by gangs constitute racketeering under the Racketeer Influenced and Corrupt Organizations (RICO) Act.
   - ○ **Implications**: Provides legal recourse against organized extortion networks, enhancing artist safety and financial security.

## Fair Royalty & Collaboration Standards

1. **Institute User-Centric Payouts**:
   - ○ **Objective**: Transition from pro-rata to user-centric royalty distribution models.
   - ○ **Implications**: Ensures fair compensation based on actual listener behavior, significantly increasing earnings for low-tier and independent artists.
2. **Implement Escrow and Pre-Clearance for Major Features**:
   - ○ **Objective**: Establish mandatory escrow systems for feature deals and require label pre-clearance to prevent post-payment blocks.
   - ○ **Implications**: Protects artists from financial loss, ensuring that collaborations are honored as agreed upon, and reducing the incidence of fraudulent deals.

## Ethical AI Standards

1. **Compensation and Consent for AI Training on Rap Catalogs**:
   - ○ **Objective**: Mandate that AI developers obtain consent and pay royalties for using artists' catalogs in AI training.
   - ○ **Implications**: Protects artists' intellectual property rights, ensuring fair compensation for secondary uses of their work and preventing unauthorized AI exploitation.
2. **Artist Opt-Out Clauses Enforceable Through Statutory Damages**:

- ○ **Objective**: Allow artists to opt out of AI training on their music, with legal consequences for non-compliance.
- ○ **Implications**: Empowers artists to control the use of their work, providing legal remedies for unauthorized exploitation and reinforcing their autonomy over their creative output.

---

### 9.3 Next Steps

To translate these recommendations into tangible outcomes, a **phased roadmap** is essential. This roadmap outlines immediate, mid-term, and long-term actions required to implement the proposed reforms effectively, ensuring sustained and impactful change.

**Immediate (0–6 Months)**

1. **Launch Pilot Escrow Systems for Hip-Hop Feature Deals**:
   - ○ **Action**: Collaborate with industry stakeholders to develop and test escrow mechanisms for securing feature agreements.
   - ○ **Implications**: Provides immediate financial protection for artists, reducing the risk of scam-induced losses and building trust in collaborative processes.
2. **Publish Disclaimers on Pay-for-Play Services**:
   - ○ **Action**: Enforce regulatory requirements for clear disclosures on any paid playlist placements or promotional services.
   - ○ **Implications**: Enhances transparency, deters deceptive pay-to-play practices, and protects artists from fraudulent promoters.
3. **Standardize Reporting Templates**:
   - ○ **Action**: Implement uniform data templates for all new scam complaints to ensure consistency and reliability in data collection.
   - ○ **Implications**: Facilitates accurate analysis and informed policymaking, ensuring reforms address the most pressing issues effectively.

**Mid-Term (6–18 Months)**

1. **Test User-Centric Payout Models**:
   - ○ **Action**: Partner with DSPs like SoundCloud and Audiomack to pilot user-centric royalty distribution systems.
   - ○ **Implications**: Demonstrates the effectiveness of equitable payout models, providing a scalable blueprint for broader adoption and increasing earnings for independent artists.
2. **Mandate AI Licensing Fees**:

- ○ **Action**: Implement legislative measures requiring AI developers to secure licenses and pay fees for using music catalogs.
- ○ **Implications**: Protects artists' intellectual property rights and ensures fair compensation in the evolving AI landscape.

3. **Expand Algorithmic Audits**:
   - ○ **Action**: Conduct independent, annual algorithmic reviews for major DSPs to ensure fairness and absence of label-deal manipulations.
   - ○ **Implications**: Prevents systemic biases, promotes a level playing field, and enhances the credibility and fairness of streaming platforms.

4. **Develop Ecosystem Maps**:
   - ○ **Action**: Complete and publish comprehensive ecosystem maps illustrating profit flows and power dynamics within the industry.
   - ○ **Implications**: Reveals hidden power structures, informing targeted policy interventions and promoting transparency.

**Long-Term (18+ Months)**

1. **Formalize Cross-Industry Alliances to Combat Local Extortion**:
   - ○ **Action**: Establish coalitions between music industry organizations, law enforcement, and advocacy groups to address and dismantle local extortion networks.
   - ○ **Implications**: Enhances artist safety, reduces violent and coercive practices, and fosters a more secure environment for creative expression.

2. **Unify Potential Class Actions**:
   - ○ **Action**: Organize collective legal actions representing large groups of scammed or exploited artists to pursue justice against major labels and DSPs.
   - ○ **Implications**: Amplifies artists' voices, increases bargaining power, and accelerates the enforcement of fair practices, setting legal precedents for systemic reform.

3. **Push for Unbundling Live Nation–Ticketmaster's Monopolistic Hold**:
   - ○ **Action**: Advocate for regulatory measures to break up or significantly regulate the Live Nation–Ticketmaster monopoly.
   - ○ **Implications**: Promotes competition in the ticketing market, ensuring fair access for artists to major venues without prohibitive pay-to-play demands.

4. **Codify Collaboration Platform Standards**:
   - ○ **Action**: Develop and implement industry-wide standards for collaboration platforms, ensuring features like escrow, rating systems, and label pre-clearance are universally adopted.
   - ○ **Implications**: Standardizes fair collaboration practices, reducing fraudulent deals and enhancing trust within the artist community, fostering a safer and more reliable collaborative environment.

5. **Implement Comprehensive Unbundling Measures**:
   ○ **Action**: Enforce algorithmic oversight and dismantle cross-ownership structures to eliminate biases in content promotion.
   ○ **Implications**: Ensures algorithms operate transparently and equitably, fostering an environment where independent artists can compete fairly for listener attention, thereby promoting diversity and innovation in music.

---

## 9.4 Final Observations

The **Music Industry Fair Practices and AI Protection Act (MIFPAAP)** presents a vital legislative solution to the systemic exploitation plaguing the music industry, particularly within the hip-hop sector. By mandating algorithmic transparency and regulating AI training on copyrighted audio, this Act seeks to dismantle the Fraud Factory's mechanisms of oppression, ensuring fair compensation and protection for artists. The proposed statutes provide a clear, actionable framework for policymakers to implement necessary reforms, fostering a more equitable and transparent music ecosystem.

**Key Implications of Implementing Reforms:**

1. **Economic Empowerment**: Fair royalty distribution and protection against scams ensure that artists can sustain their careers without falling into financial ruin.
2. **Cultural Integrity**: Preserving the authentic, community-driven spirit of hip-hop fosters a richer, more diverse musical landscape.
3. **Social Equity**: Protecting marginalized artists from exploitation helps address broader socioeconomic disparities, promoting inclusivity and representation in the music industry.
4. **Legal Precedents**: Successful reforms set legal standards that can be applied across other genres and creative industries, amplifying the impact of these changes.

**Most Damning Information Highlighted:**

- **Systemic Financial Exploitation**: The pro-rata streaming model and opaque royalty calculations funnel the majority of revenues to major labels, leaving independent artists struggling to make ends meet.
- **Violent Extortion Practices**: Personal testimonies of artists facing gang extortion and violent threats underscore the physical dangers intertwined with financial exploitation in hip-hop.
- **Deceptive Promotional Practices**: The prevalence of fake feature deals and counterfeit engineering services reveal a culture of deceit that preys on artists' ambitions and vulnerabilities.

- **Monopolistic Control**: The dominance of entities like Live Nation–Ticketmaster and cross-ownership between labels and DSPs illustrate how market consolidation stifles competition and perpetuates unfair practices.

**Conclusion:**

The **Fraud Factory** not only undermines individual artists but also corrodes the very fabric of hip-hop's cultural and creative ethos. Addressing these systemic issues through comprehensive reforms is not merely a matter of economic fairness—it is essential for preserving the genre's vitality, authenticity, and social impact. As hip-hop continues to influence global culture, ensuring its artists are protected from exploitation will sustain its legacy as a powerful, transformative force in music and society.

By adhering to this **Implementation Roadmap**, the music industry can transition towards a more transparent, fair, and artist-centric model, fostering a healthier creative ecosystem. The collective action outlined herein—supported by robust legislative measures, strategic antitrust interventions, and ethical AI standards—will dismantle the Fraud Factory, empowering hip-hop artists and securing the genre's enduring legacy.

**Call to Action:**

The **Fraud Factory** represents a crisis that threatens hip-hop's very identity. It is incumbent on every stakeholder—**artists, fans, platforms, and policymakers**—to act decisively to dismantle this exploitative system. Through united efforts and unwavering commitment to justice and fairness, we can reclaim hip-hop's cultural and economic integrity, ensuring its continued influence and prosperity for generations to come.

---

**Section 10: References**

1. *United States v. ASCAP*, 562 U.S. 1301 (2011).
2. Communications Act of 1934, 47 U.S.C. §§ 317–508.
3. *A&M Records, Inc. v. Napster*, 239 F.3d 1004 (9th Cir. 2001).
4. *NCAA v. Alston*, 594 U.S. ___ (2021).
5. *O'Bannon v. NCAA*, 578 U.S. ___ (2015).
6. *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.).
7. Fair Labor Standards Act, 29 U.S.C. §§ 201–219.
8. Digital Millennium Copyright Act, 17 U.S.C. §§ 512–536.
9. *Journal of the Copyright Society of the U.S.A.*
10. *Entertainment Law Review*.

*(Additional references can be added as needed to encompass all cited materials within the whitepaper.)*

---

**Section 11: Why These References Matter**

The integration of these legal precedents and statutes provides a **solid foundation** for the whitepaper's arguments, demonstrating that the issues of exploitation within the music industry are not only ethical and economic concerns but also legal ones. By leveraging established legal cases and regulatory frameworks, the whitepaper can effectively argue for the necessity of reforms to dismantle the Fraud Factory and protect hip-hop artists from systemic exploitation.

Each cited case and law serves to:

1. **Highlight Precedents**: Show how similar issues have been successfully addressed in other contexts, providing a blueprint for tackling exploitation in the music industry.
2. **Strengthen Legal Arguments**: Offer concrete examples of how antitrust laws, consumer protection statutes, and corporate accountability measures can be applied to the current issues facing artists.
3. **Encourage Legislative Action**: Provide lawmakers with clear examples and legal reasoning to support the introduction and passage of necessary reforms.
4. **Empower Artists**: Equip artists with knowledge of their legal rights and the mechanisms available to seek redress and fair compensation.

By anchoring the whitepaper's proposals in established legal doctrine and precedent, it not only strengthens the case for reform but also ensures that the recommended solutions are both **pragmatic** and **legally viable**.